JAMES G. WILSON, PLAINTIFF, v. LEWIS ROUSSEAU AND CHARLES EASTON.

The eighteenth section of the patent act of 1836 authorized the extension of a patent, on the application of the executor or administrator of a deceased patentee.

Such an extension does not inure to the benefit of assignees under the original patent, but to the benefit of the administrator (when granted to an administrator), in his capacity as such. But those assignees who were in the use of the patented machine at the time of the renewal have still a right to use it.

The extension could be applied for and obtained by the administrator, although the original patentee had, in his lifetime, disposed of all his interest in the then existing patent. Such sale did not carry any thing beyond the term of the original patent.

A covenant by the patentee, made prior to the law authorizing extensions, that the covenantee should have the benefit of any improvement in the machinery, or alteration or renewal of the patent, did not include the extension by an administrator, under the act of 1836. It must be construed to include only renewals obtained upon the surrender of a patent on account of a defective specification. Parties to contracts look to established and general laws, and not to special acts of Congress.

A plaintiff, therefore, who claims under an assignment from the administrator, can maintain a suit against a person who claims under the covenant

An assignee of an exclusive right to use two machines within a particular district can maintain an action for an infringement of the patent within that district, even against the patentee.

In the case of Woodworth's planing-machine, the patent granted to the administrator was founded upon a sufficient specification and proper drawings, and is valid.

The decision of the Board of Commissioners, to whom the question of renewal is referred, by the act of 1836, is not conclusive upon the question of their jurisdiction to act in a given case.

The Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years. Such surrender and renewal may be made at any time during such extended term.

THIS case, and the three subsequent ones, namely, Wilson v. Turner, Simpson et al. v. Wilson, and Woodworth & Bunn v. Wilson, were argued together, being known as the patent cases.* Many of the points of law involved were common to them all, and those which were fully argued in the first case which came up were but incidentally touched in the discussion of the subsequent cases.

---

* The reporter intended to publish the arguments of counsel in these patent cases *in extenso*, and with that view applied for and obtained from many of the counsel their arguments prepared by themselves; but circumstances beyond his control prevent him from executing this purpose. He returns his thanks to those gentlemen who so kindly furnished him with their arguments, and regrets that his original design has been frustrated.

They all related to the rights which were derived under a patent for a planing-machine, taken out by Woodworth, and renewed and extended by his administrators. The validity of the original patent was questioned only in one case, namely, that which came from Kentucky, which was the last argued. There were four cases in all, namely, one from New York, one from Maryland, one from Louisiana, and one from Kentucky. In the course of the argument, counsel referred indiscriminately to the four records, as some documents were in one which were not to be found in another.

The cases will be taken up and reported *seriatim*, and the documents which are cited in the first will not be repeated in the others.

The first in order was the case from New York, the titling of which is given at the head of this report.

It came up from the Circuit Court of the United States for the Northern District of New York, on a certificate of division in opinion.

On the 26th of November, 1828, William Woodworth presented the following petition.

" To the Honorable Henry Clay, Secretary of State of the United States.

" The petition of William Woodworth, of the city of Hudson, in the county of Columbia and State of New York, respectfully represents :

" That your petitioner has invented a new and improved method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, not known or used before the application by him, the advantages of which he is desirous of securing to himself and his legal representatives. He therefore prays that letters patent of the United States may be issued, granting unto your petitioner, his heirs, administrators, or assigns, the full and exclusive right of making, constructing, using, and vending to others to be used, his aforesaid new and improved method, agreeably to the acts of Congress in such case made and provided ; your petitioner having paid thirty dollars into the treasury of the United States, and complied with the other provisions of the said acts.

　　　　　　　　　　WILLIAM WOODWORTH.

" *November 26th,* 1828."

On the 4th of December, 1828, Woodworth executed to James Strong the following assignment.

" Whereas I, William Woodworth, of the city of Hudson, in the State of New York, heretofore, to wit, on the 13th day of

September, 1828, assigned and transferred, for a legal and valuable consideration, the one equal half of all my right, title, claim, and interest in and to the invention or improvement mentioned and intended in the foregoing petition, oath, and specification, to James Strong, of the city of Hudson.

" And whereas, also, the subjoined assignment is intended only to convey and assign the same interest transferred and assigned in the assignment of the 13th of September above mentioned, without any prejudice to my one equal half part of said invention or improvement, which is expressly reserved to myself and my legal representatives.

" Now, know all men, that I, the said William Woodworth, for and, in consideration of the sum of ten dollars, and other valuable considerations me moving, have, and do hereby, for myself and legal representatives, give, assign, transfer, and assure to the said James Strong and his legal representatives the one full and eq... half of all my right, title, interest, and claim in and to my new and improved method of planing, tonguing, grooving, and cutting into mouldings, either plank, boards, or any other material, and for reducing the same to an equal width and thickness, and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, mentioned and intended to be secured by the foregoing petition, oath, and specification, together with all the privileges and immunities, as fully and absolutely as I do or shall enjoy or possess the same; to have and to hold and enjoy the same, to the said James Strong, and his legal representatives, do or may.

" In witness whereof, I have hereunto set my hand and seal, the 4th day of December, 1828.

WILLIAM WOODWORTH. [SEAL.]

" Witnesses : —

HENRY EVERTS,
DAVID GLEASON."

On the 6th of December, 1828, Woodworth took the following oath.

" *State of New York, Rensselaer County, ss.:*

" On this sixth day of December, A. D. 1828, before the subscriber, a justice of the peace in and for the county of Rensselaer aforesaid, personally appeared the aforesaid William Woodworth, and made solemn oath, according to law, that he verily believes himself to be the true and original inventer of the new and improved method, above described and specified, for planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick,

Wilson *v.* Rousseau et al.

and cutting mouldings on, or facing, metallic, mineral, or other substances ; and that he is a citizen of the United States.

JOHN THOMAS, *Justice of the Peace.*"

The above documents appear to be recorded in the third volume of Transfers of Patent Rights, pages 155, 156, in the patent-office of the United States.

On the 27th of December, 1828, a patent was issued as follows.

" *Letters Patent to W. Woodworth.*

" The United States of America to all to whom these letters patent shall come :

" Whereas William Woodworth, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, which improvements, he states, have not been known or used before his application ; hath made oath that he does verily believe that he is the true inventer or discoverer of the said improvement; hath paid into the treasury of the United States the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvements, and praying that a patent may be granted for that purpose. These are, therefore, to grant, according to law, to the said William Woodworth, his heirs, administrators, or assigns, for the term of fourteen years from the 27th of December, 1828, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said William Woodworth himself, in the schedule hereto annexed, and is made a part of these presents.

" In testimony whereof, I have caused these letters to be made patent, and the seal of the United States to be hereunto affixed. Given under my hand, at the city of Washington, this 27th day of December, in the year of our Lord 1828, and of the independence of the United States of America, the fifty-third.

[L. s.]

· (Signed,)             J. Q. ADAMS.

" By the President.

(Signed,)     H. CLAY, *Secretary of State.*"

*Certificate of Wm. Wirt, Attorney-General of the United States.*

" *City of Washington, to wit :*

" I do hereby certify, that the foregoing letters patent were de-

livered to me on the 27th day of December, in the year of our Lord 1828, to be examined; that I have examined the same, and find them conformable to law; and I do hereby return the same to the Secretary of State, within fifteen days from the date aforesaid, to wit, on this 27th day of December, in the year aforesaid.

WM. WIRT,

*Attorney-General of the United States.*"

*Schedule.*

"The schedule referred to in these letters patent, and making part of the same, containing a description, in the words of the said William Woodworth himself, of his improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances.

"The plank, boards, or other material, being reduced to a width by circular saws or friction-wheels, as the case may be, is then placed on a carriage, resting on a platform, with a rotary cutting-wheel in the centre, either horizontal or vertical. The heads or circular plates, fixed to an axis, may have one of the heads movable, to accommodate any length of knife required. The knife fitted to the head with screws or bolts, or the knives or cutters for moulding fitted by screws or bolts to logs, connecting the heads of the cylinder, and forming with the edges of the knives or cutters a cylinder. The knives may be placed in a line with the axis of the cylinder, or diagonally. The plank, or other material resting on the carriage, m'y be set so as to reduce it to any thickness required; and the carriage, moving by a rack and pinion, or rollers, or any lateral motion, to the edge of the knives or cutters on the periphery of the cylinder or wheel, reduces it to any given thickness. After passing the planing and reducing wheel, it then approaches, if required, two revolving cutter-wheels, one for cutting the groove, and the other for cutting the rabbets that form the tongue; one wheel is placed directly over the other, and the lateral motion moving the plank, or other material, between the grooving and rabbeting wheels, so that one edge has a groove cut the whole length, and the other edge a rabbet cut on each side, leaving a tongue to match the groove. The grooving-wheel is a circular plate fixed on an axis, with a number of cutters attached to it to project beyond the periphery of the plate, so that when put in motion it will perform a deep cut or groove, parallel with the face of the plank or other material. The rabbeting-wheel, also of similar form, having a number of cutters on each side of the plate, projecting like those on the grooving-wheel, cuts the rabbet on the side of the edge of the plank, and leaves the tongue or match for the

groove. By placing the planing-wheel axis and cutter-knives vertical, the same wheel will plane two planks or other material in the same time of one, by moving the plank or other material opposite ways, and parallel with each other against the periphery of the planing or moulding wheel. The groove and tongue may be cut in the plank or other material at the same time, by adding a grooving and rabbeting wheel.

" Said William Woodworth does not claim the invention of circular saws or cutter-wheels, knowing they have long been in use ; but he claims as his invention the improvement and application of cutter or planing wheels to planing boards, plank, timber, or other material ; also his improved method of cutters for grooving and tonguing, and cutting mouldings on wood, stone, iron, metal, or other material, and also for facing and dressing brick ; as all the wheels may be used single and separately for moulding, or any other purpose before indicated. He also claims, as his improved method, the application of circular saws for reducing floor-plank, and other materials, to a width.

" *Dated Troy, December 4th*, 1828.

WILLIAM WOODWORTH.

"Henry Everts,
D. S. Gleason,  } Witnesses."

On the 25th of April, 1829, one Uri Emmons obtained a patent for a new and useful improvement in the mode of planing floor-plank, and grooving, and tonguing, and straightening the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine. The said letters patent, and specification attached thereto, being in the following words and figures.

*Uri Emmons's Patent.*

" United States of America to all to whom these letters patent shall come :

" Whereas, Uri Emmons, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the mode of planing floor-plank and grooving and tonguing the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called ' the cylindrical planing-machine,' which improvement he states has not been known or used before his application, hath made oath that he does verily believe that he is the true inventer or discoverer of the said improvement, hath paid into the treasury of the United States the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose. These are therefore to grant, according to law, to the said Uri Emmons, his

heirs, administrators, or assigns, for the term of fourteen years from the twenty-fifth day of April, one thousand eight hundred and twenty-nine, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given, in the words of the said Uri Emmons himself, in schedule hereto annexed, and is made a part of these presents.

" In testimony whereof, I have caused these letters to be made patent, and the seal of the United States to be hereunto affixed.

" Given under my hand, at the city of Washington, this twenty-fifth day of April, in the year of our Lord one thousand eight hundred and twenty-nine, and of the independence of the United States of America the fifty-third.

[SEAL.]       (Signed,)       ANDREW JACKSON.

" By the President.
(Signed,)       M. VAN BUREN."

" *City of Washington, to wit :* —

" I do hereby certify that the foregoing letters patent were delivered to me on the twenty-fifth day of April, in the year of our Lord one thousand eight hundred and twenty-nine, to be examined ; that I have examined the same, and find them conformable to law ; and I do hereby return the same to the Secretary of State, within fifteen days from the date aforesaid, to wit, on the twenty-fifth day of April in the year aforesaid.

(Signed,)       J. MACPHERSON BERRIEN,
*Attorney-General of the United States.*"

### Schedule.

" The schedule referred to in these letters patent, and making part of the same, containing a description, in the words of the said Uri Emmons himself, of his improvement in the mode of planing floor-plank, and grooving, and tonguing, and straightening the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine.

" The machinery for the improvement consists, —

" 1st. Of a frame of wood or metal.

" 2d. Of the gear and fixtures combined and connected together for the above-named operation, the principle of which consists in running the plank, boards, or timber over, under, or at the sides of a cylinder of wood or metal, on which knives are placed, straight or spiral, with their edges exactly corresponding with each other, having from two to twelve knives or edges ; also burrs or saws, similar to those used for cutting teeth in brass wheels, to groove and tongue the edge of the boards or plank as they pass through between rollers, or on a carriage, by the surface of the cylinder.

The shape, form, and construction of the above principle may be varied in shape and position, dimensions, &c., still the same in substance, — the same principle producing the same effect. I have, by experimental operation, found that the following mode in form is the best : —

" 1st: A frame composed of two pieces of timber, from twelve to eighteen feet long, about six by ten inches broad, placed about fifteen inches apart, framed together with four girths, one at each end, and at equal distances from the centre, and flush with the under side. This frame is supported by posts of a proper length, framed into the under side of the above pieces of timber, and braced so as to be of sufficient strength to maintain the operative posts. There is placed a roller in the centre, of metal or hard wood, across the frame, the surface of the roller being even with the surface of the frame ; directly above, and parallel with this roller, is hung the cylinder, with two or four spiral edges or knives, six to ten inches diameter, and hung on a cast-steel arbor, resting in movable boxes attached to the sides of the frame, so as to set the cylinder up and down from the roller, to give the thickness of the timber to be planed. On each side of the cylinder is placed a pair of feeding-rollers, of hard wood or metal, the under one of each pair being level with the centre one. The upper ones are hung in boxes, which are pressed down with springs or weights, so that when the timber comes between them, they will hug and carry it through. These rollers are connected and turned by wheels, at a velocity of about twelve feet surface of the roller per minute. The cylinder with two edges to make about two thousand five hundred revolutions per minute, cutting five thousand strokes every twelve feet ; this can be varied according to the number of edges, power, and velocity of the different parts. The power is attached to the cylinder by a bolt running on a pulley, on the outward end of the cylinder shaft. Each way from the feeding-rollers is placed rollers about two feet apart for the timber to rest on while running through. On one side of the frame is fastened a straight edge, to serve as a guide, lined with metal ; on the other side, rollers are placed in a piece of timber, which is pressed up to the plank or board to keep it close to the guide or straight edge by a spring. The grooving and tonguing is done by burrs or circular cutters similar to a saw ; these burrs are hung on perpendicular spindles, the arbors of which rest in boxes attached to the inward side of the frame, a burr on one side to cut the groove, and on the other is placed two burrs, just as far apart as the thickness of the above one, for cutting the groove. At or near one end of the frame is hung a shaft, with a drum or roller, from which belts pass over to pulleys on each spindle of the burrs or circular cutters, which must have about the same velocity of the cylinder. These burrs are placed on one side of the cylinder, opposite to each

c 3 *

Wilson v. Rousseau et al.

other, so as to cut the tongue to match the groove; on the other side of the cylinder is an arbor parallel with the cylinder, on which is placed circular cutters for planing the edges of the board or plank as they pass through. The cutter on the side next to the guide is stationary on the arbor; the opposite one is movable in the arbor, but fastened with screws to set it for different widths. A belt runs from a pulley on the end of the arbor, outside the frame, to the said drum, as also the same from the cylinder, each having about the same motion. The feeding-rollers are put in motion by a belt from the slow part of the driving power. I have also put in operation a carriage for feeding, but rollers save the time of running the carriage back.

"Now, what I, the said Uri Emmons, consider and claim as my improvement, and for which I solicit a patent, is as follows, namely :—

"1st. The principle of planing boards and plank with a rotary motion, with knives or edges on a cylinder, placed upon the same, straight or spiral, as before described, which I put in operation at Syracuse, in the county of Onondaga, in the State of New York, in the early part of the year 1824.

"2d. The burrs for grooving and tonguing, in contradistinction from the mode used by William Woodworth, he using the duck-bill cutters.

"3d. The feeding, by running the timber through on a carriage, or between feeding-rollers, guided by a straight edge, as before described.

"In testimony that the aforegoing is a true specification of my said improvement, as before described, I have hereunto set my hand and seal, the eighth day of April, in the year of our Lord one thousand eight hundred and twenty-nine.

(Signed,)      URI EMMONS.

"Witnesses, — THOS. THOMAS.
SILAS HATHAWAY."

On the 16th of May, 1829, the said Emmons sold his entire interest in the last-mentioned patent to Daniel H. Toogood, Daniel Halstead, and William Tyack, by the following instrument : —

*Deed from Emmons to Toogood, Halstead, and Tyack.*

"Whereas Uri Emmons, of the State of New York, machinist, has received letters patent of the United States of America, dated April 25th, one thousand eight hundred and twenty-nine, [for] the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, a new and useful improvement in the mode of planing floor-plank, and grooving and tonguing, and straightening the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine.

" Now, know all men by these presents, that I, Uri Emmons, of the city of New York, in consideration of five dollars, to me in hand paid by Daniel H. Toogood, Daniel Halstead, and William Tyack, all of said city of New York, who fully viewed and considered the said improvement, and the said patent and specifications therein contained, have granted, sold, and conveyed, and by these presents do grant, sell, and convey, to the said Daniel H. Toogood, Daniel Halstead, and William Tyack, their heirs, executors, administrators, and assigns, the full and exclusive right and liberty derived from the said patent, of making, using, and vending to others to be made, used, and sold, the said improvement, within and throughout the United States of America. To have and to hold and enjoy all the privileges and benefits which may in any way arise from the said improvement by virtue of said letters patent. And I do hereby empower the said Daniel H. Toogood, Daniel Halstead, and William Tyack, their heirs, executors, administrators, and assigns, to commence and prosecute to final judgment and execution, at their own cost, any suit or suits against any person or persons who shall make, use, or vend the said improvement, contrary to the intent of the said letters patent and law in such case made and provided, and to receive, for their own benefit, the avails thereof, in such manner as I might do.

" In witness whereof, I have hereunto set my hand and seal, this sixteenth day of May, in the year of our Lord one thousand eight hundred and twenty-nine.

URI EMMONS. [SEAL.]

" Witnesses, — THOMAS AP THOMAS.
ALEX. DEDDER."

" City and County of New York, ss. :

" Be it remembered, that on the sixteenth day of May, in the year of our Lord one thousand eight hundred and twenty-nine, before me, personally appeared Uri Emmons, known to me to be the person described in, and who executed, the within deed, and acknowledged that he executed the same for the purposes therein mentioned ; and there being no material alterations, erasures, or interlineations, I allow the same to be recorded.

THOMAS THOMAS, Commissioner, &c."

On the 28th of November, 1829, the following mutual deed of assignment was executed between Woodworth and Strong, on the one part, and Toogood, Halstead, Tyack, and Emmons, on the other part, by which Woodworth and Strong convey to Toogood, Halstead, and Tyack all their interest in the patent of December 27th, 1828, in the following places, namely: — In the city and county of Albany, in the State of New York ; in the State of Maryland, except the western part which lies west of the Blue Ridge ; in Tennessee, Alabama, South Carolina, Georgia, the Floridas,

Louisiana, Missouri, and the territory west of the Mississippi ; and Toogood, Halstead, Tyack, and Emmons—conveyed to Strong and Woodworth all their interest in Emmons's patent of 25th April, 1829, for the rest and residue of the United States ; by which mutual deed of assignment the parties agreed, that any improvement in the machinery, or alteration, or renewal of either patent, such improvement, alteration, or renewal should accrue to the benefit of the respective parties in interest, and might be applied and used within their respective districts.

### Mutual Deed between Woodworth, Strong, Toogood, Halstead, Tyack, and Emmons.

" Know all men by these presents, that William Woodworth, now of the city of New York, the patentee of an improved method of planing, tonguing, grooving, &c., &c., plank, boards, &c., by letters patent from the United States, dated December 29th, 1828, and James Strong, of the city of Hudson, in the State of New York, the assignee of one equal half of the rights and interests secured by the aforesaid letters patent, of the one part, and Uri Emmons, of the city of New York, the patentee of an improvement in the mode of planing floor-plank, and grooving, tonguing, and straightening the edges of the same, &c., by letters patent from the United States, dated April 25th, 1829, and Daniel H. Toogood, Daniel Halstead, and William Tyack, of the city of New York, the assignees, by deed dated the 16th day of May, 1829, of all the rights and interest secured by the last aforesaid patent to said Emmons, of the other part, in consideration of the following covenants and agreements, do hereby covenant and agree as follows : —

" First. The said Woodworth and Strong, and their assigns, have, and hereby do assign to the said Toogood, Halstead, and Tyack, and their assigns, all their right and interest in the aforesaid patent to William Woodworth, to be sold and used, and the plank or other materials prepared thereby to be vended and used, in the following places, namely : — In the city and county of Albany, in the State of New York ; in the State of Maryland, except the western part thereof which lies west of the Blue Ridge ; in Tennessee, Mississippi, Alabama, South Carolina, Georgia, the Floridas, Louisiana, and the territory west of the River Mississippi, and not in any other State or place within the limits of the United States or the Territories thereof. To have and to hold the rights and privileges hereby granted to them and their assigns for and during the term of fourteen years from the date of the patent ; and they are also authorized to prosecute, at their own costs and charges, any violation of the said patent, in the same manner as the patentee, Woodworth, might lawfully do.

" Secondly. The said Emmons, Toogood, Halstead, and Tyack,

in consideration aforesaid, have, and hereby do covenant and agree to assign, and do assign, for themselves and assigns, to the said Woodworth and Strong and their assigns, all their right and interest in the aforesaid patent granted to the said Uri Emmons, to be sold and used, and the plank or other material prepared thereby to be vended and used, in all and singular the rest and residue of the United States, and the Territories thereof, that is to say, in all places other than in those especially assigned to the said Toogood, Halstead, and Tyack, as aforesaid. To have and to hold the said rights and privileges hereby granted to them and their assigns for and during the term of fourteen years from the date of the said letters patent to the said Uri Emmons ; and they are also authorized to prosecute, at their own costs and charges, any violation of the said patent, in the same manner as the patentee, Uri Emmons, might lawfully do.

"Thirdly. And the two parties further agree, that any improvement in the machinery, or alteration, or renewal of either patent, such alteration, improvement, or renewal shall accrue to the benefit of the respective parties in interest, and may be applied and used within their respective districts as hereinbefore designated.

"Witness our hands and seals, at the city of New York, the 28th of November, 1829.

WILLIAM WOODWORTH. [SEAL.]
JAMES STRONG. [SEAL.]
WILLIAM TYACK, [SEAL.]
D. H. TOOGOOD. [SEAL.]
DANIEL HALSTEAD. [SEAL.]
URI EMMONS. [SEAL.]

" Sealed and delivered, in presence of
THOMAS AP THOMAS,
Witness to the signing of Toogood, Tyack, Halstead, and Emmons."

Under this mutual assignment, the respective parties and their assignees would possess the following rights, namely : if they claimed under Woodworth's patent, to use the same for fourteen years from the 29th of December, 1828, that is to say, until the 29th of December, 1842 ; and if they claimed under Emmons's patent, to use the same for fourteen years from the 25th of April, 1829, that is to say, until the 25th of April, 1843.

On one or the other of these days, therefore, if things had remained in the same condition, all rights either in the patentees or their assignees would have ceased, as far as respected an exclusive use of the thing patented.

In 1836, Congress passed an act from which the following is an extract, and the construction of which was the chief controversy. (Act approved 4th July, 1836, ch. 357, 5 Lit. & Brown's ed. 117,

§ 18.) "And be it further enacted, that whenever any patentee of an invention or discovery shall desire an extension of his patent beyond the term of its limitation, he may make application therefor, in writing, to the Commissioner of the Patent-office, setting forth the grounds thereof; and the Commissioner shall, on the applicant's paying the sum of forty dollars to the credit of the treasury, as in the case of an original application for a patent, cause to be published in one or more of the principal newspapers in the city of Washington, and in such other paper or papers as he may deem proper, published in the section of country most interested adversely to the extension of the patent, a notice of such application, and of the time and place when and where the same will be considered, that any person may appear and show cause why the extension should not be granted. And the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the evidence produced before them, both for and against the extension, and shall sit for that purpose at the time and place designated in the published notice thereof. The patentee shall furnish to the said board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention. And if, upon a hearing of the matter, it shall appear to the full and entire satisfaction of said board, having due regard to the public interest therein, that it is just and proper that the term of the patent should be extended, by reason of the patentee, without neglect or fault upon his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the Commissioner to renew and extend the patent, by making a certificate thereon of such extension, for the term of seven years from and after the expiration of the term; which certificate, with a certificate of said board of their judgment and opinion as aforesaid, shall be entered on record in the patent-office; and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years. And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein. Provided, however, that no extension of a patent shall be granted after the expiration of the term for which it was originally issued."

On the 3d of February, 1839, William Woodworth, the patentee, died; and on the 14th of February, 1839, William W. Woodworth took out letters of administration upon his estate, in the county of New York.

In 1842, William W. Woodworth, the administrator, applied for

Wilson v. Rousseau et al.

an extension of the patent under the above-recited act of 1836, and on the 16th of November, 1842, the board issued the following certificate.

" In the matter of the application of William W. Woodworth, administrator on the estate of William Woodworth, deceased, in writing to the Commissioner of Patents for the extension of the patent for a new and useful improvement in the method of planing, tonguing, and grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, granted to the said William Woodworth, deceased, on the 27th day of December, 1828, for fourteen years from said 27th day of December.

" The applicant having paid into the treasury the sum of forty dollars, and having furnished to the undersigned a statement in writing, under oath, of the ascertained value of the invention, and of the receipt and expenditures thereon, sufficiently in detail to exhibit a true and faithful account of loss and profits in any manner accruing to said patentee from or by reason of said invention ; and notice of application having been given by the Commissioner of Patents, according to law, said board met at the time and place appointed, namely, at the patent-office, on the 1st September, 1842, and their meetings having been continued by regular adjournments until this 16th day of November, 1842, they, on that day, heard the evidence produced before them, both for and against the extension of said patent, and do now certify, that, upon hearing of the matter, it appears to their full and entire satisfaction, having due regard to the public interest therein, that it is just and proper that the term of said patent should be extended, by reason of the patentee, without neglect on his part, having failed to obtain from the use and sale of his invention a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use.

" Washington city, Patent-office, November 16th, 1842.

DANIEL WEBSTER,
*Secretary of State.*
CHAS. B. PENROSE,
*Solicitor of the Treasury.*
HENRY L. ELLSWORTH,
*Commissioner of Patents.*'

And on the same day the Commissioner of Patents issued the following certificate.

" Whereas, upon the petition of William W. Woodworth, administrator of the estate of William Woodworth, deceased, for an

extension of the within patent, granted to William Woodworth, deceased, on the 27th day of December, 1828. The Board of Commissioners, under the eighteenth section of the act of Congress approved the 4th day of July, 1836, entitled an act to promote the progress of useful arts, to repeal all acts and parts of acts heretofore made for that purpose, did, on the 16th day of November, 1842, certify that the said patent ought to be extended.

"Now, therefore, I, Henry L. Ellsworth, commissioner of patents, by virtue of the power vested in me by said eighteenth section, do renew and extend said patent, and certify that the same is hereby extended for the term of seven years from and after the expiration of the first term, namely, the 27th day of December, 1842, which certificate of said Board of Commissioners, together with this certificate of the Commissioner of Patents, having been duly entered of record in the patent-office, the said patent now has the same effect in law as though the term had been originally granted for the term of twenty-one years.

        "In testimony whereof, I have caused the seal of the
[SEAL.]    patent-office to be hereunto affixed, this 16th day of
        November, 1842.

                      HENRY L. ELLSWORTH,
                          *Commissioner of Patents.*"

On the 2d of January, 1843, William W. Woodworth, the administrator, filed the following disclaimer.

"To all men to whom these presents shall come, I, William W. Woodworth, of Hyde Park, in the county of Duchess and State of New York, Esq., as I am administrator of the goods and estate which were of William Woodworth, deceased, hereinafter named, send greeting :

"Whereas letters patent, bearing date on the twenty-seventh day of December, in the year of our Lord eighteen hundred and twenty-eight, were granted by the United States to William Woodworth, now deceased, for an improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, boards, plank, or any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances. And whereas, before the term of fourteen years, for which the said letters patent were granted, had fully expired, such proceedings were had that, pursuant to the act of Congress in such case made and provided, the said letters patent were renewed or extended for the term of seven years from and after the expiration of the said term of fourteen years, and to the certificate granting the said extension and renewal unto me in my said capacity, bearing date on the sixteenth day of November now last past, and which is duly recorded according to act of Congress in that behalf, reference is

Wilson v. Rousseau et al.

hereby made, as showing my title and interest in and to the said letters patent.

" And whereas the said William Woodworth, through inadvertence, accident, or mistake in his application for letters patent, made his specification of claim too broad, in this, namely, that he, the said William Woodworth, claimed as his improved method the application of circular saws for reducing floor-plank and other material to width, of which he was not the original and first inventer. And whereas some material and substantial part of the said patented thing was justly and truly the invention and improvement of the said William Woodworth.

" Now therefore know ye, that I, the said William Woodworth, in my capacity aforesaid, and as the person to whom the said certificate was granted as aforesaid, have disclaimed, and do by these presents, for myself, and for all claiming under me, disclaim, all and any exclusive right, title, property, or interest of, in, or to the application of circular saws for reducing floor-plank or other materials to a width, by reason of the aforesaid letters patent, and the aforesaid renewal or extension thereof.

" In testimony whereof, I have hereto, in my capacity aforesaid, set my hand and seal, on this second day of January, in the year eighteen hundred and forty-three.

   WILLIAM W. WOODWORTH,
   *Administrator of W. Woodworth, deceased.* [SEAL.]
" Executed in presence of
   CHAS. W. EMESN.
   B. R. CURTIS."

In March, 1843, Woodworth, the administrator, made an assignment of his patent rights in some of the States to James G. Wilson, the plaintiff. At what time the assignment was made for New York, the record in that case did not state, but it was one of the admitted facts that he was the grantee. The assignment first referred to was recorded in the patent-office in Liber 4, pp. 291, 292, on the 20th of March, 1843.

On the 9th of August, 1843, the administrator assigned his right to Wilson, in and for the State of Maryland.

On the 26th of February, 1845, Congress passed the following act.

" An Act to extend a Patent heretofore granted to William Woodworth.

" Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the patent granted to William Woodworth on the twenty-seventh day of December, in the year one thousand eight hundred and twenty eight, for his improvement on the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or

any other material, and for reducing the same to an equal width and thickness ; and also for facing and dressing brick, and cutting mouldings on and facing several other substances, a description of which is given in a schedule annexed to the letters patent granted as aforesaid, be, and the same is, hereby extended for the term of seven years from and after the 27th day of December in the year one thousand eight hundred and forty-nine ; and the Commissioner of Patents is hereby directed to make a certificate of such extension in the name of the administrator of the said William Woodworth, and to append an authenticated copy thereof to the original letters patent, whenever the same shall be requested by the said administrator or his assigns.

    " Approved February 26, 1845.

    " A true copy from the roll of this office.
               R. K. CRALLE, *Chief Clerk.*

    " *Department of State, March 3, 1845.*"

    And on the 3d of March, 1845, the following certificate was issued.

    " In conformity, therefore, with the directions in the said act contained, I, Henry L. Ellsworth, Commissioner of Patents, do hereby certify, that the patent therein described is, by the said act, extended to William W. Woodworth, administrator of said William Woodworth, for the term of seven years from and after the twenty-seventh day of December in the year one thousand eight hundred and forty-nine ; and this certificate of such extension is made on the original letters patent, on the application of William W. Woodworth, the administrator of the said William Woodworth.

    " In testimony whereof, I have caused the seal of the patent-office to be hereunto affixed, this 3d day of March, 1845.
[L. S.]           HENRY L. ELLSWORTH,
                 *Commissioner of Patents.*"

    On the 8th of July, 1845, a new patent was issued, with an amended specification, as follows:

    " The United States of America to all to whom these letters patent shall come :

    " Whereas, William W. Woodworth, administrator of William Woodworth, deceased, of Hyde Park, N. Y., has alleged that said William Woodworth invented a new and useful improvement in machines for planing, tonguing, and grooving, and dressing boards, &c., for which letters patent were granted, dated the 27th day of December, 1828, which letters patent have been extended (as will appear by the certificates appended thereto, copies of which are hereunto attached) for fourteen years from the expiration of said letters patent ; and which letters patent are hereby cancelled on

account of a defective specification, which he states has not been known or used before said William Woodworth's application ; has made oath that he is, and that said William Woodworth was, a citizen of the United States ; that he does verily believe that said William Woodworth was the original and first inventer or discoverer of the said improvement, and that the same hath not, to the best of his knowledge and belief, been previously known or used ; has paid into the treasury of the United States the sum of fifteen dollars, and presented a petition to the Commissioner of Patents, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose.

" These are therefore to grant, according to law, to the said William W. Woodworth, in trust for the heirs at law of said W. Woodworth, their heirs, administrators, or assigns, for the term of twenty-eight years from the twenty-seventh day of December, one thousand eight hundred and twenty-eight, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said William W. Woodworth, in the schedule hereunto annexed, and is made part of these presents.

" In testimony whereof, I have caused these letters to be made patent, and the seal of the patent-office has been hereunto affixed.

[L. s.]

" Given under my hand, at the city of Washington, this eighth day of July, in the year of our Lord one thousand eight hundred and forty-five, and of the independence of the United States of America the seventieth.

JAMES BUCHANAN,
*Secretary of State.*"

" Countersigned, and sealed with the seal of the patent-office.
HENRY H. SYLVESTER,
*Acting Com'r of Patents.*"

" The schedule referred to in these letters patent, and making part of the same : —

" To all whom it may concern : — Be it known, that the following is a full, clear, and exact description of the method of planing, tonguing, and grooving plank or boards, invented by William Woodworth, deceased, and for which letters patent of the United States were granted to him on the 27th day of December, in the year one thousand eight hundred and twenty-eight ; the said letters patent having been surrendered for the purpose of describing the same invention, and pointing out in what it consists, in more clear, full, and exact terms than was done in the original specification.

## " *Amended Specification.*

" The plank or boards which are to be planed, tongued, or grooved are first to be reduced to a width by means of circular saws, by reducing-wheels, or by any other means. When circular saws are used for this purpose, two such saws should be placed upon the same shaft, on which they are to be capable of adjustment, so that they may be made to stand at any required distance apart ; under these the board or plank is to be forced forward, and brought to the width required ; this apparatus and process do not require to be further explained, they being well understood by mechanicians.

" When what has been above denominated reducing-wheels are used, these are to consist of revolving cutter-wheels, which resemble in their construction and action the planing and reducing wheel to be presently described ; these are to be made adjustable like the circular saws, but the latter are preferred for this purpose. The plank may be reduced to a width on a separate machine.

" When the plank or boards have been thus prepared (on a separate machine), they may be placed on or against a suitable carriage, resting on a frame or platform, so as to be acted upon by a rotary cutting or planing and reducing wheel ; which wheel may be made to revolve either horizontally or vertically, as may be preferred. The carriage which sustains the plank or board to be operated upon may be moved forwards by means of a rack and pinion, by an endless chain or band, by geared friction-rollers, or by any of the devices well known to machinists for advancing a carriage or materials to be acted upon in machines for various purposes. The plank or board is to be moved on towards the cutting edges of the cutters or knives, on the planing-cylinder, so that its knives or cutters, as they revolve, may meet and cut the plank or board in a direction contrary to that in which it is made to advance ; the edges of the cutters are, in this method, prevented from coming first into contact with its surface, and are made to cut upwards from the reduced part of the plank towards said surface, by which means their edges are protected from injury by gritty matter, and the board or plank is more evenly and better planed than when moved in the reversed direction.

" After the board or plank passes the planing-cylinder, and as soon, or fast, as the planing-cylinder has done its work on any part of the board or plank, the edges are brought into contact with two revolving cutter-wheels, one of which wheels is adapted to the cutting of the groove, and the other to the cutting of the two rebates that form the tongue. When the axis of the planing and reducing wheel stands vertically, the grooving and tonguing wheels are placed one above the other, with the plank edgewise between

them; when the axis of the planing-wheel stands horizontally, these wheels are on the same horizontal plane with each other, standing on perpendicular spindles.

"The grooving-wheel consists of a circular plate fixed on an axis, and having one, two, three, four, or more cutters, which are to be screwed, bolted, or otherwise attached to it, the edges of which cutters project beyond the periphery of the plate to such distance as is required for the depth of the groove; their thickness may be such as is necessary for its width; the are, of course, so situated as to cut the groove in the middle of the edge of the board, or as nearly so as may be required. The tonguing-wheel is similar in form to the grooving-wheel, but it has cutters on each of its sides, or otherwise, so formed and arranged as to cut the two rebates which are necessary to the formation of the tongue.

"The grooving and tonguing cutters, at the same time and by the same operation, reduce the board or plank to an exact width throughout. When the axis of the planing-wheel is placed vertically, the knives or cutters may be made to plane two planks at the same time; the planks being in this case moved in contrary directions, and so as to meet the edges of the revolving knives or cutters. When the machine is thus constructed, a second pair of grooving and tonguing wheels may be made to operate in the same way with those above described. A machine to operate upon a single plank or board, and having the axis of the planing-wheel placed horizontally, will however be more simple and less expensive than that intended to operate on two planks simultaneously.

"In the accompanying drawing, fig. 1 is a perspective representation of the principal operating parts of the machine when arranged and combined for planing, tonguing, and grooving; and when so arranged as to be capable of planing two planks at the same time, the axis of the planing-wheel being placed vertically. A A is a stout substantial frame of the machine, which may be of wood or of iron, and may be varied in length, size, and strength, according to the work to be done. B B are the heads of the planing-cylinder, and C C, the knives or cutters, which extend from one to the other of said heads, to the peripheries of which they may be attached by means of screws. The knives C C, with the faces forming a planing angle, may be placed in a line with the axis, J, of the cylinder, or they may stand obliquely thereto, as may be preferred; but in the latter case the edge should form the segment or portion of a helix: b represents a pulley near to the upper end of the axis J; and I, a pulley or drum, which may be made to revolve by horse, steam, or other motive power, and from which a belt may extend around the pulley b, to drive the planing-cylinder and other parts of the machinery; G is the carriage, which is represented as being driven forward by means of a rack

and pinion, H ; against this carriage, the plank K, which is to be planed, tongued, and grooved, is placed, and is made to advance with it.   It will be manifest, however, that the plank may be moved forward by other means, as, for example, by an endless chain or band, passing around drums or chain-wheels, or by means of geared friction-wheels borne up against it.   To cause the carriage and plank to move forward readily, there may be friction-rollers, $fff$, placed horizontally, and extending under them ; the rollers, $fff$, which stand vertically, are to be made to press against the plank and keep it close to the carriage, and thus prevent the action of the cutters from drawing the plank up from its bed in cutting from the planed surface upwards ; they may be borne against it by means of weights or springs, in a manner well known to machinists.   In a single horizontal machine, the horizontal friction-rollers may be geared, and the pressure-rollers placed above them to feed the board with or without the carriages, a bed-plate being used directly under the planing-cylinder.

" Fig. 2 is a separate view of the planing-cylinder, with its knives or cutters ; and fig. 3, an end view of one of the heads.   E E are the revolving cutters, or tonguing and grooving wheels, and D D, whirls upon their shafts, which may be driven by bands, or otherwise, so as to cause said wheels to revolve in the proper direction.

" Fig. 4 is a side view of one of these wheels ; fig. 5 is an edge view of the tonguing-wheel ; and fig. 6, an edge view of the grooving-wheel ; the latter being each shown with two cutters in place.   The number of cutters on these wheels may be varied, but they are represented as furnished with four.   The cutters may be fixed on the sides of circular plates, with their edges projecting beyond the periphery of said plate.

" The edges of the plank, as its planed part passes the planing-cylinder, are brought in contact with the above-described tonguing and grooving wheels, which are so placed upon their shafts as that the tongue and groove shall be left at the proper distance from the face of the plank, the latter being sustained against the planing-cylinder by means of the carriage or bed-plate, or otherwise, so that it cannot deviate, but must be reduced to a proper thickness, and correctly tongued and grooved.

" In fig. 1, above referred to, only one carriage and one pair of cutter-wheels are shown, it not being deemed necessary to represent those on the opposite side, they being similar in all respects.

" Fig. 7 represents the same machine, with the axis of the planing-cylinder placed horizontally, and intended to operate on one plank only at the same time.   A A is the frame ; B B$_1$ the heads of the planing-cylinder ; C C, the knives or cutters attached to said heads.   To meet the different thicknesses of the planks

or boards, the bearings of the shaft or cylinder may be made movable, by screws or other means, to adjust it to the work; or the carriage or bed-plate may be made so as to raise the board or plank up to the planing-cylinder. E and E' are the revolving cutters, or tonguing and grooving wheels, which are placed upon vertical shafts, having upon them pulleys, D D, around which pass belts or bands from the main drum, I, to which a revolving motion may be given by any adequate motive power.

" From the drum, I, a belt, L, passes also around the pulley, b, on the shaft of the planing-cylinder, and gives to it the requisite motion. There may in this machine be a horizontal carriage moved forward by a rack and pinion, in a manner analogous to that represented in fig. 1; but in the present instance the plank is supposed to be advanced by means of one or two pairs of friction or feed rollers, shown at $ff'$; the uppermost, $f'f'$, of the pairs of rollers may be held down by springs, or weighted levers, which it has not been thought necessary to show in this drawing, as such are in common use. The lowermost of these rollers may be fluted or made rough on their surfaces, so as to cause friction on the under side of the plank. M M' are pulleys on the axles of these lower rollers which are embraced by bands, N N', which also pass around a pulley, O, on a shaft which crosses the frame, A A, and has a pulley, T, on it, which is embraced by the belt, P, on a pulley, Q, on the shaft of the main drum, I; these bands and pulleys serve to give motion to the feed-rollers, as will be readily understood by inspecting the drawing. R R are guide-strips, used in place of the rollers used for the same purpose, and also for bearing or friction rollers, when the machine is vertical, to direct one edge of the plank, and against its opposite edge; any pressure may be used equal to the weight of the board or plank, when worked in a vertical position. One of the cutter-wheels should be made adjustable, to adapt it to stuff of different widths.

" The planing-cylinder, and likewise the cutter or tonguing and grooving wheels, may be constructed in the manner represented in figures 2, 3, 4, 5, and 6, and hereinbefore fully described. One of the heads of the planing-wheel may be made movable, to accommodate its width to the width of the boards or plank to be planed.

" The respective parts of this machine may be varied in size, as may also the velocity of the motion of the planing-cylinders and cutter-wheels; but the following has been found to answer well in practice. The planing-cylinder, having four knives or cutters, may be twelve inches in diameter, and may make two thousand and upwards revolutions in a minute. In a machine like that shown in fig. 7, the main drum, I, may be two feet in diameter, and may be driven with the speed of five hundred and upwards revolutions in a minute. The pulleys on the planing-cylinder, and on the

cutter-wheels, may be six inches in diameter. The plank should be moved forward at the rate of about one foot for every hundred revolutions of the cutter-wheel; and, of course, the diameter of the feed-rollers and of the pulleys by which they are turned must be so graduated as to produce this result. The size and speed of the above parts of this machine may be in some degree varied; but the above have been found to work well.

"Having thus fully described the parts and combination of parts, and operation of the machine for planing, tonguing, and grooving boards or plank, and shown various modes in which the same may be constructed and made to operate without changing the principle or mode of operation of the machine, what is claimed therein as the invention of William Woodworth, deceased, is the employment of rotating planes, substantially such as herein described, in combination with rollers, or any analogous device, to prevent the boards from being drawn up by the planes when cutting upwards, or from the reduced or planed to the unplaned surface, as described.

"And also the combination of the rotating planes with the cutter-wheels for tonguing and grooving, for the purpose of planing, tonguing, and grooving boards, &c., at one operation, as described. And also the combination of the tonguing and grooving cutter-wheels for tonguing and grooving boards, and at one operation, as described.

"And, finally, the combination of, either the tonguing or the grooving cutter-wheel for tonguing or grooving boards, &c., with the pressure-rollers, as described, the effect of the pressure-rollers in these operations being such as to keep the boards, &c., steady, and prevent the cutters from drawing the boards towards the centre of the cutter-wheels, whilst it is moved through by machinery. In the planing operation, the tendency of the plane is to lift the boards directly up against the rollers; but in the tonguing and grooving, the tendency is to overcome the friction occasioned by the pressure of the rollers.

WILLIAM W. WOODWORTH,
*Administrator of William Woodworth, deceased.*

"Witnesses:—
JAMES MILHOLLAND,
CHS. M. KELLER."

The above papers show the title of the administrator, who was the grantor of Wilson, the plaintiff in the suit. The record in the New York case was exceedingly brief, and contained neither the declaration nor pleas, but only the state of the pleadings and the existence of demurrers. But from the eighth fact in the statement of facts, in which it is said that "the defendants trace no title to themselves to a right to use said machines from the assignment

made by William Woodworth and James Strong to Halstead, Toogood, and Tyack," the inference must be, that their defence was in showing an outstanding title.

The following is the entire case presented by the New York record.

"*United States of America, Northern District of New York:*

" At a Circuit Court of the United States, begun and held at Albany, for the Northern District of New York, on Tuesday, the twenty-first day of October, in the year of our Lord one thousand eight hundred and forty-five, and in the seventieth year of American independence.

" Present, the Honorable Samuel Nelson and Alfred Conkling, Esquires.

" James G. Wilson
*v.*
Lewis Rousseau and Charles Easton.

" *State of the Pleadings.*

" This is an action on the case to recover damages for the alleged infringement of letters patent issued to William Woodworth, on the 27th day of December, 1828, for the term of fourteen years, for an improvement in machinery for planing, tonguing, and grooving boards and plank at one operation; which letters patent were, on the 16th day of November, 1842, extended for seven years more, such extension being granted to William W. Woodworth, as administrator of said William Woodworth.

" To the first count of the plaintiff's declaration, the defendants interposed three several special pleas in bar, to each of which pleas the plaintiff demurred, and the defendants joined in demurrer. To the second count of the plaintiff's declaration, the defendants demurred, and the plaintiff joined in demurrer.

" The case coming on to be argued at this term, the following questions occurred for decision, to wit:—

" 1. Whether the eighteenth section of the patent act of 1836 authorized the extension of a patent on the application of the executor or administrator of a deceased patentee.

" 2. Whether, by force and operation of the eighteenth section of the act of July 4th, 1836, entitled " An act to promote the progress of the useful arts," &c., the extension granted to William W. Woodworth, as administrator, on the 16th day of November, 1842, inured to the benefit of assignees, under the original patent granted to William Woodworth, on the 27th day of December, 1828, or whether said extension inured to the benefit of the administrator only, in his said capacity.

" 3. Whether the extension specified in the foregoing second point inured to the benefit of the administrator to whom the same

was granted, and to him in that capacity exclusively ; or whether, as to the territory specified in the contract of assignment made by William Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th day of November, 1829 (and set forth in the second plea of the defendants to the first count of the declaration), and by legal operation of the covenants contained in said contract, the said extension inured to the benefit of the said Toogood, Halstead, and Tyack, or their assigns.

" 4. Whether the plaintiff, claiming title under the extension from the administrator, can maintain an action for an infringement of the patent right within the territory specified in the contract of assignment to Toogood, Halstead, and Tyack, against any person not claiming under said assignment ; or whether the said assignment be of itself a perfect bar to the plaintiff's suit.

" 5. Whether the extension specified in the second point could be applied for and obtained by William W. Woodworth, as administrator of William Woodworth, deceased, if the said William Woodworth, the original patentee, had, in his lifetime, disposed of all his interest in the then existing patent, having, at the time of his death, no right or title to, or interest in, the said original patent ; or whether such sale carried with it nothing beyond the term of said original patent ; and, if it did not, whether any contingent rights remained in the patentee or his representatives.

" 6. Whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within said town ; or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee.

" 7. Whether the letters patent of renewal issued to William W. Woodworth, as administrator aforesaid, on the 8th day of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law ; or whether the same be void, for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

" 8. Whether the court can determine, as matter of law, upon an inspection of the said two patents and their respective specifications, that the said new patent of the 8th of July, 1845, is not for the same invention for which the said patent of 1828 was granted.

" 9. Whether the decision of the Board of Commissioners, who are to determine upon the application for the extension of a patent, under the eighteenth section of the act of 1836, is conclusive upon the question of their jurisdiction to act in the given case.

" 10. Whether the Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and

pending the existence of an extended term of seven years ; or whether such surrender and renewal may be made at any time during such extended term.

"On which questions the opinions of the judges were opposed.

"Whereupon, on a motion of the plaintiff, by William H. Seward, his counsel, that the points on which the disagreement hath happened may, during the term, be stated under the direction of the judges, and certified under the seal of the court to the Supreme Court, to be finally decided.

"It is ordered that the foregoing state of the pleadings, and the following statement of facts, which is made under the direction of the judges, be certified, according to the request of the plaintiff by his counsel, and the law in that case made and provided, to wit : —

"1. That William Woodworth, as the inventer of a machine, or improvement in machinery, for planing, tonguing, and grooving boards and plank at one operation, on the 27th day of December, in the year 1828, applied to the proper department of the government for a patent for said invention, and upon the same day, on filing his specifications and explanatory drawings, and complying with the other legal prerequisites, letters patent, signed by the President, and under the seal of the United States, were duly issued to the said William Woodworth, granting to him the exclusive right, throughout the United States, to construct and use, and vend to others to be used, the machine or improvement patented, for and during the term of fourteen years from the said 27th day of December, 1828.

"2. That subsequently, to wit, on the 28th day of November, 1829, the said William Woodworth and James Strong, who had become jointly interested with said Woodworth in the rights secured by the said letters patent by contract of assignment of that date, transferred to Daniel H. Toogood, Daniel Halstead, and William Tyack all their right and interest in and to the said patent for certain parts and portions of the United States in said contract specifically set forth, including the city and county of Albany, in the State of New York, which is the domicile of the defendants.

"3. That the *habendum* in said contract of assignment is in the words following, to wit : —

"'To have and to hold the rights and privileges hereby granted for and during the term of fourteen years from the date of the patent.'

"And that the third clause in said contract of assignment is in the following words, to wit : —

"'And the two parties further agree, that any improvement in the machinery, or alteration or renewal of either patent, such improvement, alteration, or renewal, shall inure to the benefit of the respective parties interested, and may be applied and used within their respective districts, as hereinbefore designated.'

" 4. That previous to the expiration of the fourteen years' limitation of said patent, William Woodworth, the patentee, died, to wit, on the 9th of February, 1839 ; that William W. Woodworth was thereupon duly appointed, and now is, administrator of the estate of the said William Woodworth, and that said Woodworth, in his lifetime, had sold all his interest in the said original patent.

" 5. That William W. Woodworth, as administrator aforesaid, on the 16th day of November, 1842, under the eighteenth section of the act of Congress of July 4th, 1836, applied to the Board of Commissioners created by the said section for an extension of said patent ; and that, upon complying with the requisites in said section prescribed, an extension of said patent was granted by said board to William W. Woodworth, as administrator of the estate of William Woodworth, on said 16th day of November, 1842, and letters patent of extension were on said day duly issued to him, granting to him, in his aforesaid capacity, the exclusive right to make and use, and vend to others to be used, the said invention or improvement, for the term of seven years from and after the term of limitation of said original patent.

" 6. That on the 8th day of July, 1845, the said William W. Woodworth, in his capaci y as administrator aforesaid, and in accordance with the provisions of the thirteenth section of the said act of July 4th, 1836, made a surrender to the Commissioner of Patents of the letters patent to him granted on the 16th day of November, 1842, for an insufficiency of the specification upon which said original patent was issued, and upon filing a corrected and amended specification, with explanatory drawings, a copy of which is annexed hereto and made a part of this statement, the said Commissioner, on said 8th day of July, 1845, issued to the said William W. Woodworth new letters patent of said invention for the unexpired term of the first extension thereof, and of the extension granted by special act of Congress on the 26th day of February, 1845.

" 7. That the defendants in this action have erected and put in operation, in the town of Watervliet, which is within the county of Albany and State of New York, one or more machines for planing, tonguing, and grooving boards and plank, substantially the same in principle and mode of operation as that the subject of the patent granted to William Woodworth.

" 8. That the defendants trace no title to themselves to a right to use said machines from the assignment made by William Woodworth and James Strong to Halstead, Toogood, and Tyack.

" 9. That the plaintiff in this action is the grantee of William W. Woodworth, as administrator, of the exclusive right to construct and use, and vend to others to be used, two of said patented machines within said town of Watervliet, in said county of Albany and State of New York."

Wilson *v.* Rousseau. et al.

The case was argued by *Mr. Seward, Mr. Latrobe,* and *Mr. Webster* (the two latter dividing the points), on behalf of the plaintiff, and *Mr. Stevens,* for the defendants. The reporter has been kindly furnished with the arguments of these gentlemen, but his limits will not permit their publication *in extenso,* and he is unwilling to take the responsibility of condensing them.

Mr. Justice NELSON delivered the opinion of the court.

The questions in this case come before us on a certificate of division of opinion from the Circuit Court of the United States for the Northern District of New York, involving the construction of various provisions of the act of Congress to promote the progress of useful arts, commonly called the patent act. We shall examine the questions in the order in which they appear on the record. The first is as follows : —

1. Whether the eighteenth section of the act of 1836 authorized the extension of a patent on the application of the executor or ad-, ministrator of a deceased patentee.

The eighteenth section provides, in substance, that whenever any patentee of an invention or discovery shall desire an extension of his patent beyond the term of its limitation, he may make application therefor, in writing, to the Commissioner of the Patent-office, setting forth the grounds thereof. That the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the application ; the patentee shall furnish to the board a statement in writing, under oath, of the value and usefulness of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of the invention ; and if, upon a hearing of the matter, it shall appear to the satisfaction of the board, having a due regard to the public interest, that it is just and proper the term of the patent should be extended, by reason of the patentee, without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the commissioner to renew and extend the patent, by making a certificate thereon of such extension for the term of seven years from and after the expiration of the first term, &c.

This is the substance of the section, so far as is material to the consideration of the question ; and it will be seen, that, according to the words of the provision, the application is to be made by, and the new term to be granted to, the patentee himself, and hence the objection on account of its having been granted to the administrator.

The main argument relied on to support the objection is, that the patentee had no interest or right of property in the extended term at

the time of his death. That all he had was a mere possibility, too remote and contingent to be regarded as property, or any right of property, in the sense of the law, and therefore not as sets or rights in the hands of the administrator which would authorize an application within the meaning of the statute.

At common law, the better opinion, probably, is, that the right of property of the inventer to his invention or discovery passed from him as soon as it went into public use with his consent ; it was then regarded as having been dedicated to the public, as common property, and subject to the common use and enjoyment of all.

The act of Congress for the encouragement of inventers, and to promote the progress of the useful arts, and for the purpose of remedying the imperfect protection, or rather want of protection, of this species of property, has secured to him, for a limited term, the full and exclusive enjoyment of his discovery.

The law has thus impressed upon it all the qualities and characteristics of property, for the specified period ; and has enabled him to hold and deal with it the same as in case of any other description of property belonging to him, and on his death it passes, with the rest of his personal estate, to his egal representatives, and becomes part of the assets.

Congress have not only secured to the inventer this absolute and indefeasible interest and property in the subject of the invention for the fourteen years, but have also agreed, that upon certain conditions occurring and to be shown, before the expiration of this period, to the satisfaction of a board of commissioners, an indifferent tribunal designated for the purpose, this right of property in the invention shall be continued for the further term of seven years. Subject to this condition, the right of property in the second term is as perfect, to the extent of the intent, as the right of property in the first.

The circumstances upon which the condition rests, and the occurrence of which gives effect and operation to the further grant of the government, are by no means uncommon, or difficult to be shown. They have often happened to inventers in the course of their dealings with this species of property. The act of Congress contemplates their occurrence again, and has therefore provided further security and protection, by enlarging the interest and right of property in the subject of their invention.

The provision is founded upon the policy of the government to encourage genius, and promote the progress of the useful arts, by holding out an additional inducement to the enjoyment of the right secured under the first term ; and as an act of justice to the inventers for the time, ingenuity, and expense bestowed in bringing out the discovery, frequently of incalculable value to the business interests of the country. And it is apparent, therefore, unless the executor or administrator is permitted to take the place of the

patentee in case of his death, and make application for the grant of the second term, which continues the exclusive enjoyment of the right of property in the invention, the object of the statute will be defeated, and a valuable right of property, intended to be secured, lost to his estate.

The statute is not founded upon the idea of conferring a mere personal reward and gratuity upon the individual, as a mark of distinction for a great public service, which would terminate with his death ; but of awarding to him an enlarged interest and right of property in the invention itself, with a view to secure to him, with greater certainty, a fair and reasonable remuneration. And to the extent of this further right of property, thus secured, whatever that may be, it is of the same description and character as that held and enjoyed under the patent for the first term. In its nature, therefore, it continues, and is to be dealt with, after the decease of the patentee, the same as an interest under the first, and passes, with other rights of property belonging to him, to the personal representatives, as part of the effects of the estate.

It would seem, therefore, from the nature of this interest in an extended term itself, as well as from a consideration of the object and purpose of the statute, plainly expressed upon its face, in providing for the prolonged enjoyment and protection of this species of property, that the Board of Commissioners were well warranted in making the renewed grant to the administrator, upon his complying with the conditions.

An argument has been urged against this conclusion, grounded upon the tenth and thirteenth sections of the patent law. The former provides in express terms for the issuing of a patent to the executor or administrator, in case of the death of the inventer before it is taken out ; and the latter, for a surrender of a patent defective by reason of an insufficient description, and the reissuing of a new one. These are supposed to be analogous cases, and manifest the sense of Congress, that, without the express provisions of law, the patent in the one case, and the surrender in the other, could not be issued to, or be made by, the legal representative. The argument is no doubt a proper one, and entitled to consideration ; but is not necessarily conclusive.

As it respects the provision for a surrender by the executor or administrator, which is most analogous to the question in hand, we think there could be no great doubt that the right would exist in the absence of any such express authority, regard being had to the nature of the property, and the rights and duties of the legal representative, within the spirit and object of the patent law. It would be the surrender of a patent, the legal interest and property in which had become vested in him as part of the assets, which he was bound to take care of, and protect against waste ; a step necessary to perfect the title and give value to the property

would seem to be not only directly within the line of his duty, but in furtherance of the chief object of the law, namely, to secure remuneration to the meritorious inventer.

It has also been argued, that the executor or administrator could not comply with the terms and conditions of the eighteenth section, upon which the right of property in the extended term is made to depend. In other words, that he would be unable to furnish to the Board of Commissioners a statement under oath of the usefulness of the invention, and of the receipts and expenditures of the patentee, exhibiting a true and faithful account of the loss and profit in any manner accruing from, and by reason of, the invention. This argument assumes as a matter of fact that which may well be denied. Suppose the dealings of the patentee in the subject of his discovery have been carried on through the instrumentality of agents or clerks, or, if not, that the patentee himself, as business men usually do, has kept an accurate account of his receipts and expenditures, all difficulty at once disappears. The account-books of a deceased party, in many of the States of the Union, identified and the handwriting proved, are received as legal evidence of the demand in the courts of justice, and afford full authority, upon legal principles, for the admission of the books before the board, in support of the application. We perceive no great difficulty in a substantial compliance with the terms of the section, on the part of the executor or administrator.

The second question is, Whether, by force and operation of the eighteenth section already referred to, the extension granted to W. W. Woodworth, as administrator, on the 16th day of November, 1842, inured to the benefit of assignees under the original patent granted to William Woodworth, on the 27th day of December, 1828, or whether said extension inured to the benefit of the administrator only, in his said capacity.

The most of this section has already been recited in the consideration of the first question, and it will be unnecessary to repeat it. It provides for the application of the patentee to the commission for an extension of the patent for seven years; constitutes a board to hear and decide upon the application; and if his receipts and expenditures, showing the loss and profits accruing to him from and on account of his invention, shall establish, to the satisfaction of the board, that the patent should be extended by reason of the patentee, without any fault on his part, having failed to obtain from the use and sale of his invention a reasonable remuneration for his time, ingenuity, and expense bestowed upon the same, and the introduction of it into use, it shall be the duty of the commissioners to extend the same by making a certificate thereon of such extension for the term of seven years from and after the first term; "and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one

Wilson *v.* Rousseau et al.

years." And then comes the clause in question : — " *And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein.*"

The answer to the second question certified depends upon the true construction of the above clause respecting the rights of assignees and grantees.

Various and conflicting interpretations have been given to it by the learned counsel, on the argument, leading to different and opposite results, which it will be necessary to examine.

On one side, it has been strongly argued, that the legal operation and effect of the clause save and protect all the rights and interests of assignees and grantees in the patent existing at the time of the extension ; and thus secure and continue the exclusive use and enjoyment of these rights and interests for the seven years, to the same extent, and in as ample a manner, as held and enjoyed under the first term. That if A. holds an assignment of a moiety of the patent, he will hold the same for the new term of seven years ; if of the whole patent, then the whole interest for that period. And that as soon as the new grant is made to the patentee, the interest therein passes, by operation of this clause, to the assignees of the old term, in proportion to their respective shares.

On the other side, it has been argued, with equal earnestness, that, according to the true construction and legal effect of the clause, protection is given, and intended to be given, only to the rights and interests of assignees and grantees acquired and held by assignments and grants from the patentee in and under the second or new term ; and that it does not refer to, or embrace, or in any way affect the rights and interests of assignees or grantees holding under the old. In connection with this view, it is said that the rights thus protected in the new term may be acquired by means of the legal operation of the clause, either from a direct assignment or grant after the extension of the patent, or by an appropriate provision for that purpose, looking to an extension, contained in the assignment or grant un       the old.

It is not to be denied, but that, upon any view that has been taken or that may be taken of the clause, its true meaning and legal effect cannot be asserted with entire confidence ; and, after all, must depend upon such construction as the court can best give to doubtful phraseology and obscure legislation, having a due regard to the great object and intent of Congress, as collected from the context and general provisions and policy of the patent law.

The rule is familiar and well settled, that, in case of obscure and doubtful words or phraseology, the intention of the law-makers is to be resorted to, if discoverable from the context, in order to fix and control their meaning so as to reconcile it, if possible, with the general policy of the law.

E 3 *

Now, the serious difficulty in the way, and which renders the first interpretation inadmissible, except upon the most explicit and positive words, is, that it subverts at once the whole object and purpose of the enactment, as is plainly written in every line of the previous part of the section. It gives to the assignees and grantees of the patent, as far as assigned under the old term, the exclusive right and enjoyment of the invention — the monopoly — in the extended term for the seven years ; when, by the same provision, it clearly appears that it was intended to be secured to the patentee as an additional remuneration for his time, ingenuity, and expense in bringing out the discovery, and in introducing it into public use. It gives this remuneration to parties that have no peculiar claims upon the government or the public, and takes it from those who confessedly have.

The whole structure of the eighteenth section turns upon the idea of affording this additional protection and compensation to the patentee, and to the patentee alone, and hence the reason for instituting the inquiry before the grant of the extension, to ascertain whether or not he has failed to realize a reasonable remuneration from the sale and use of the discovery, — the production of an account of profit and loss to enable the board to determine the question ; and as it comes to the one or the other conclusion, to grant the extended term or not.

It is obvious, therefore, that Congress had not at all in view protection to assignees. That their condition on account of dealing in the subject of the invention, whether successful or otherwise, was not in the mind of that body, nor can any good reason be given why it should have been.

They had purchased portions of the interest in the invention, and dealt with the patent rights as a matter of business and speculation ; and stood in no different relation to the government or the public, than other citizens engaged in the common affairs of life.

Nothing short of the most fixed and positive terms of a statute could justify an interpretation so repugnant to the whole scope and policy of it, and to wise and judicious legislation.

We think this construction not necessarily required by the language of the clause, and is altogether inadmissible.

Then as to the second interpretation, namely, that the clause refers to, and includes, assignees and grantees of interests acquired in the new term, either by an assignment or grant from the patentee after the extension, or by virtue of a proper clause for that purpose, in the assignment under the old term.

The difficulty attending this construction lies in the uselessness of the clause upon the hypothesis, — the failure to discover any subject-matter upon which to give reasonable operation and effect to it, — and hence, to adopt the construction is to make the clause

virtually a dead letter, the grounds for which conclusion we will proceed to state.

The eleventh section of the patent act provides, that every patent shall be assignable, in law, either as to the whole interest, or any undivided part thereof, by an instrument in writing; which assignment, and also every grant and conveyance of the exclusive right under any patent, &c., shall be recorded in the patent-office. And the fourteenth section authorizes suits to be brought in the name of the assignee or grantee, for an infringement of his rights, in a court of law.

One object of these provisions found in the general patent system is to separate the interest of the assignee and grantee from that which may be held by the patentee, and to make each fractional interest held under the patent distinct and separate; in other words, to change a mere equitable into a legal title and interest, so that it may be dealt with in a court of law.

Now, in view of these provisions, it is difficult to perceive the materiality of the clause in question, as it respects the rights of assignees and grantees held by an assignment or grant in and under the new term, any more than in respect to like rights and interests in and under the old.

The eleventh and fourteenth sections embrace every assignment or grant of a part or the whole of the interest in the invention, and enable these parties to deal with it, in all respects, the same as the patentee. They stand upon the same footing, under the new term, as in the case of former assignments under the old. Nothing can be clearer. It is impossible to satisfy the clause by referring it to these assignments and grants; or to see how Congress could, for a moment, have imagined that there would be any necessity for the clause, in this aspect of it. It would have been as clear a work of supererogation as can be stated.

The only color for the argument in favor of the necessity of this clause, in the aspect in which we are viewing it, is as respects the contingent interest in the new term, derived from a provision in an assignment under the old one, looking to the extension. As the right necessarily rested on contract, at least till the contingency occurred, there may be some doubt whether, even after its occurrence, the eleventh and fourteenth sections had the effect to change it into a vested legal interest, so that it could be dealt with at law; and that a new assignment or grant from the patentee would be required, which could be enforced only in a court of equity. To this extent there may be some color for the argument, — some supposed matter to give operation and effect to the clause.

But what is the amount of it? Not that the clause creates or secures this contingent interest in the new term, for that depends upon the contract between the parties, and the contract alone, and which, even if the general provisions of the law respecting

the rights of assignees and grantees could not have the effect to change into a legal right, might be enforced in a court of equity.

The only effect, therefore, of the provision in respect to assignees and grantees of this description would be, to change the nature of the contingent interest after the event happened, from a right resting in contract to a vested legal interest ; or, to speak with more precision, to remove a doubt about the nature of the interest in the new term, after the happening of a certain contingency, which event in itself was quite remote. This seems to be the whole amount of the effect that even ingenious and able counsel have succeeded in finding, to satisfy the clause. It presupposes that Congress looked to this scintilla of interest in the new term, which might or might not occur, and cast about to provide for it, for fear of doubts as to its true nature and legal character, and the effect of the general system upon it.

We cannot but think a court should hesitate before giving a construction to the clause so deeply harsh and unjust in its consequences, both as it respects the public and individual rights and interests, upon so narrow a foundation.

But there are other difficulties in the way of this construction.

The eleventh section, regulating the rights of assignees and grantees, provides, " that every patent shall be assignable at law," &c., " which assignment, and also every grant and conveyance of the exclusive right under any patent to make and use, and to grant to others to make and use, the thing patented within and throughout any specified part or portion of the United States," &c., " shall be recorded."

Now it will be apparent, we think, from a very slight examination of the clause in question, that it does not embrace assignees or grantees, in the sense of the eleventh section, at all ; nor in the sense in which they are referred to when speaking of these interests generally under the patent law, without interpolating words or giving a very forced construction to those composing it.

The clause is as follows : — " And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein."

It will be seen that the word " exclusive," used to qualify the right of a grantee in the eleventh section, and, indeed, always when referred to in the patent law (§ 14), and also the words " to make," " and to grant to others to make and use," are dropped, so that there is not only no exclusive right in the grantee, in terms, granted or secured by the clause, but no right at all, — no right whatever, — to make or to grant to others to make and use the thing patented ; in other words, no exclusive right to make or vend. And it is, we think, quite obvious, from the connection and phraseology, that assignees and grantees are placed, and were intended to be placed, in this respect, upon the same footing. We should scarcely be

justified in giving to this term a more enlarged meaning as to the right to make and sell, as it respects the one class, than is given to the others, as they are always used as correlative in the patent laws, to the extent of the interests held by them. The clause, therefore, in terms, seems to limit studiously the benefit, or reservation, or whatever it may be called, under or from the new grant to the naked right to use the thing patented ; not an exclusive right even for that, which might denote monopoly, nor any right at all, much less exclusive, to make and vend. That seems to have been guardedly omitted. We do not forget the remaining part of the sentence, " to the extent of their respective interests therein," which is relied on to help out the difficulty. But we see nothing in the phrase, giving full effect to it, necessarily inconsistent with the plain meaning of the previous words. The exact idea intended to be expressed may be open to observation ; but we think it far from justifying the court in holding, that the grant or reservation of a right to use a thing patented, well known and in general use at the time, means an exclusive right to make and use it ; and not only this, but an exclusive right to grant to others the right to make and use it, meaning an exclusive right to vend it.

The court is asked to build up a complete monopoly in the hands of assignees and grantees in the thing patented, by judicial construction, founded upon the grant of a simple right to use it to the extent of the interest possessed ; for the argument comes to this complexion. A simple right to use is given, and we are asked to read it an exclusive right, and not only to read it an exclusive right to use, but an exclusive right to make and vend, the patented article.

Recurring to the patent law, it will be seen that Congress, in granting monopolies of this description, have deemed it necessary to use very different language. The grant in the patent must be in express terms, for " the full and exclusive right and liberty of making, using, and vending," in order to confer exclusive privileges. The same language is also used in the act when speaking of portions of the monopoly in the hands of assignees and grantees. (§§ 11, 14).

We cannot but think, therefore, if Congress had intended to confer a monopoly in the patented article upon the assignees and grantees by the clause in question, the usual formula in all such grants would have been observed, and that we should be defeating their understanding and intent, as well as doing violence to the language, to sanction or uphold rights and privileges of such magnitude by the mere force of judicial construction.

We conclude, therefore, that the clause has no reference to the rights or interest of assignees and grantees under the new and extended term, upon the ground, —

1. Because, in that view, giving to the words the widest con-

struction, there is nothing to satisfy the clause, or upon which any substantial effect and operation can be given to it; it becomes virtually a dead letter, and work of legislative superfluity; and

2. Because the clause in question, upon a true and reasonable interpretation, does not operate to vest the assignees and grantees named therein with any exclusive privileges whatever, in the extended term, and therefore cannot be construed as relating to or embracing such interests in the sense of the law.

The extension of the patent under the eighteenth section is a new grant of the exclusive right or monopoly in the subject of the invention for the seven years. All the rights of assignees or grantees, whether in a share of the patent, or to a specified portion of the territory held under it, terminate at the end of the fourteen years, and become reinvested in the patentee by the new grant.

From that date he is again possessed of " the full and exclusive right and liberty of making, using, and vending to others the invention," whatever it may be. Not only portions of the monopoly held by assignees and grantees as subjects of trade and commerce, but the patented articles or machines throughout the country, purchased for practical use in the business affairs of life, are embraced within the operation of the extension. This latter class of assignees and grantees are reached by the new grant of the exclusive right to use the thing patented. Purchasers of the machines, and who were in the use of them at the time, are disabled from further use immediately, as that right became vested exclusively in the patentee. Making and vending the invention are prohibited by the corresponding terms of his grant.

Now, if we read the clause in question with reference to this state of things, we think that much of the difficulty attending it will disappear. By the previous part of the section, the patentee would become reinvested with the exclusive right to make, use, and vend the thing patented ; and the clause in question follows, and was so intended as a qualification. To what extent, is the question. The language is, " And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein" ; naturally, we think, pointing to those who were in the use of the patented article at the time of the renewal, and intended to restore or save to them that right which, without the clause, would have been vested again exclusively in the patentee. The previous part of the section operating in terms to vest him with the exclusive right to use, as well as to make and vend, there is nothing very remarkable in the words, the legislature intending thereby to qualify the right in respect to a certain class only, leaving the right as to all others in the patentee, in speaking of the benefit of the renewal extending to this class. The renewal vested him with the whole right to use, and therefore there is no great impropriety of language, if intended to pro-

Wilson v. Rousseau et al.

tect this class, by giving them in terms the benefit of the renewal. Against this view it may be said that "the thing patented" means the invention or discovery, as held in McClurg v. Kingsland, 1 How. 202, and that the right to use the "thing patented" is what, in terms, is provided for in the clause. That is admitted, but the words, as used in the connection here found, with the right simply to use the thing patented, not the exclusive right, which would be a monopoly, necessarily refer to the patented machine and not to the invention; and, indeed, it is in that sense that the expression is to be understood generally throughout the patent law, when taken in connection with the right to use, in contradistinction to the right to make and sell.

The "thing patented" is the invention; so the machine is the thing patented, and to use the machine is to use the invention, because it is the thing invented and in respect to which the exclusive right is secured, as is also held in McClurg v. Kingsland. The patented machine is frequently used as equivalent for the "thing patented," as well as for the invention or discovery, and no doubt, when found in connection with the exclusive right to make and vend, always means the right of property in the invention, the monopoly. But when in connection with the simple right to use, the exclusive right to make and vend being in another, the right to use the thing patented necessarily results in a right to use the machine, and nothing more. Then, as to the phrase "to the extent of their respective interests therein," that obviously enough refers to their interests in the thing patented, and in connection with the right simply to use, means their interests in the patented machines, be that interest in one or more at the time of the extension.

This view of the clause, which brings it down in practical effect and operation to the persons in the use of the patented machine or machines at the time of the new grant, is strengthened by the clause immediately following, which is, "that no extension of the patent shall be granted after the expiration of the term for which it was originally issued." What is the object of this provision? Obviously, to guard against the injustice which might otherwise occur to a person who had gone to the expense of procuring the patented article, or changed his business upon the faith of using or dealing with it, after the monopoly had expired, which would be arrested by the operation of the new grant. To avoid this consequence, it is provided that the extension must take place before the expiration of the patent, if at all. Now, it would be somewhat remarkable if Congress should have been thus careful of a class of persons who had merely gone to the expense of providing themselves with the patented article for use or as a matter of trade, after the monopoly had ceased, and would be disappointed and exposed to loss if it was again renewed, and at the same time had overlooked the class who in addition to this expense and change of business

had bought the right from the patentee, and were in the use and enjoyment of the machine, or whatever it might be, at the time of the renewal. These provisions are in juxtaposition, and we think are but parts of the same policy, looking to the protection of individual citizens from any special wrong and injustice on account of the operation of the new grant.

The consequences of any different construction than the one proposed to be given are always to be regarded by courts, when dealing with a statute of doubtful meaning. For between two different interpretations, resting upon judicial expositions of ambiguous and involved phraseology, that which will result in what may be regarded as coming nearest to the intention of the legislature should be preferred.

We must remember, too, that we are not dealing with the decision of the particular case before us, though that is involved in the inquiry; but with a general system of great practical interest to the country ; and it is the effect of our decision upon the operation of the system that gives to it its chief importance.

The eighteenth section authorizes the renewal of patents in all cases where the Board of Commissioners is satisfied of the usefulness of the invention, and of the inadequacy of remuneration to the patentee. Inventions of merit only are the subject of the new grant ; such as have had the public confidence, and which it may be presumed have entered largely, in one way and another, into the business affairs of life.

By the report of the Commissioner of Patents it appears, that five hundred and two patents were issued in the year 1844, — for the last fourteen years, the average issue yearly exceeded this number, — and embrace articles to be found in common use in every department of labor or art, on the farm, in the workshop, and factory. These articles have been purchased from the patentee, and have gone into common use. But, if the construction against which we have been contending should prevail, the moment the patent of either article is renewed, the common use is arrested, by the exclusive grant to the patentee. It is true the owner may repurchase the right to use, and doubtless would be compelled from necessity ; but he is left to the discretion or caprice of the patentee. A construction leading to such consequences, and fraught with such unmixed evil, we must be satisfied, was never contemplated by Congress, and should not be adopted unless compelled by the most express and positive language of the statute.

The third question certified is, whether the extension of the patent granted to W. W. Woodworth, as administrator, on the 16th of November, 1842, inured to the benefit of the administrator exclusively, or whether, as to certain territory specified in the contract of assignment made by W. Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th of November, 1829, and

by legal operation of the covenants contained in said contract, the said extension inured to the benefit of said Toogood, Halstead, and Tyack, or their assigns ?

William Woodworth was the original patentee, and took out letters patent on the 27th of December, 1828 ; and soon after conveyed a moiety of the same to James Strong. One Uri Emmons also obtained a patent for a similar machine on the 25th of April, 1829, and soon after conveyed all his interest in the same to Toogood, Halstead, and Tyack. With a view to avoid litigation, both parties mutually assigned to each other their interests in the respective patents to different and separate portions of the United States ; and in the assignment from Woodworth and Strong to Toogood, Halstead, and Tyack, the following covenant was entered into by the parties. " And the two parties further agree, that any improvement in the machinery, or alteration, or renewal of either patent, such improvement, alteration, or renewal shall inure to the benefit of the respective parties interested, and may be applied and used within their respective districts, as herein before designated."

At the time this covenant was entered into, there was no provision in the patent laws authorizing an extension or renewal of the same beyond the original term of fourteen years. The first act providing for it was passed in July, 1832. Before this time, the only mode of prolonging the term beyond the original grant was by means of private acts of Congress upon individual applications.

A construction had been given by the Circuit Court of the United States, in New York, as early as 1824, by which the patentee, on surrendering his patent on account of a defective specification, would be entitled to take out a new patent correcting the defect, which construction was afterwards upheld by this court in Grant *v.* Raymond, 6 Peters, 218, and the principle since ingrafted into the patent law by the act of 1832.

The court is of the opinion, that the covenant in question should be construed as having been entered into by the parties, with a reference to the known and existing rights and privileges secured to patentees under the general system of the government established for that purpose ; that the parties would naturally look to the established system of law on the subject in arranging their several rights and obligations, in dealing with property of this description, rather than to any possible change that might be effected by private acts of Congress upon individual application. Contracts are usually made with reference to the established law of the land, and should be so understood and construed, unless otherwise clearly indicated by the terms of the agreement. If the parties in this case contemplated any alteration or modification of their rights, more advantageous, by the further legislation of Congress, we think some more specific provision having reference to it should have been

inserted in their covenant. The term renewal may be satisfied by a reference to the law as it then stood. The patentee might surrender his patent, and take out a new one, within the fourteen years; and the term was used, probably, to guard against any question that might be raised as to the right under the assignment in the new patent, if a surrender and new issue should become necessary. The specification accompanying the patent was a complicated one, and has been the subject of much controversy, and the necessity of a surrender for correction and amendment might very well have been anticipated.

We think this view satisfies the use of the term, and that no right is acquired in the new grant by virtue of the assignment or covenant.

The fourth and fifth questions certified are answered by the opinion of the court upon the first and second questions.

The sixth question certified is as follows : — Whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within the said town ; or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee.

The plaintiff is the grantee of the exclusive right to construct and use, and to vend to others to be used, two of the patented machines within the town of Watervliet, in the county of Albany.

The fourteenth section of the patent law authorizes any person, who is a grantee of the exclusive right in a patent within and throughout a specified portion of the United States, to maintain an action in his own name for an infringement of the right.

The plaintiff comes within the very terms of the section. Although limited to the use of two machines within the town, the right to use them is exclusive. No other party, not even the patentee, can use a right under the patent within the territory without infringing the grant.

The seventh question certified is as follows : — Whether the letters patent of renewal issued to W. W. Woodworth, as administrator, on the 8th of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law, or whether the same be void for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

The court is satisfied, upon an examination of the specification and drawings referred to in the question certified, that it is sufficiently full and explicit, and is not subject to any of the objections taken to it.

The remaining questions will be sufficiently answered by the certificate sent to the court below.

Wilson *v.* Rousseau et al.

· *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Northern District of New York, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, —

1. That the eighteenth section of the patent act of 1836 did authorize the extension of a patent on the application of the executor or administrator of a deceased patentee.

2. That, by force and operation of the eighteenth section of the act of July 4th, 1836, entitled " An act to promote the progress of the useful arts," &c., the extension granted to William W. Woodworth, as administrator, on the 16th day of November, 1842, did not inure to the benefit of assignees under the original patent granted to William Woodworth on the 27th day of December, 1828, but that the said extension inured to the benefit of the administrator only, in his said capacity.

3. That the extension specified in the foregoing second point did inure to the benefit of the administrator, to whom the same was granted, and to him in that capacity exclusively ; and that, as to the territory specified in the contract of assignment made by William Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th day of November, 1829 (and set forth in the second plea of the defendants to the first count of the declaration), and by legal operation of the covenants contained in said contract, the said extension did not inure to the benefit of the said Toogood, Halstead, and Tyack, or their assigns.

4. That the plaintiff, claiming title under the extension from the administrator, can maintain an action for an infringement of the patent right within the territory specified in the contract of assignment to Toogood, Halstead, and Tyack, against any person not claiming under said assignment. And that the said assignment is not, of itself, a perfect bar to the plaintiff's suit.

5. That the extension specified in the second point could be applied for and obtained by William W. Woodworth, as administrator of William Woodworth, deceased, although the said William Woodworth, the original patentee, had in his lifetime disposed of all his interest in the then existing patent, having at the time of his death no right or title to or interest in the said original patent ; and that such sale did not carry any thing beyond the term of said original patent ; and that no contingent rights remained in the patentee or his representatives.

6. That the plaintiff, if he be an assignee of an exclusive right

to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within said town.

7. That the letters patent of renewal issued to William W. Woodworth, as administrator as aforesaid, on the 8th day of July, 1845, upon the amended specification and explanatory drawings then filed, are good and valid in law ; and are not void for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

8. That the question involved in the eighth point propounded does not present any question of law which this court can answer.

9. That the decision of the Board of Commissioners, who are to determine upon the application for the extension of a patent under the eighteenth section of the act of 1836, is not conclusive upon the question of their jurisdiction to act in a given case.

10. That the Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years ; and that such surrender and renewal may be made at any time during such extended term.

It is thereupon now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.

Mr. Justice McLEAN.

As I dissent from the opinion of the court, in their answer to to the second question certified, I will state, in few words, the reasons of my dissent.

The question is, whether the extension of the patent, under the act of 1836, to William W. Woodworth, the administrator, inured to the benefit of the assignees of the first patent.

I had occasion to consider this question in the case of Brooks and Morris v. Bicknell and Jenkins, on my circuit, and on a deliberate examination of the eighteenth section of the above act, I came to the conclusion, that unless the assignment gave to the assignee the right in the extended or renewed patent, his interest expired with the limitation of the original patent.

The lamented Justice Story, without any interchange of opinion between us, about the same time, gave the same construction to the section. The late Mr. Justice Thompson, and several of the district judges of the United States, have construed the act in the same way.

The eleventh section of the act makes the patent assignable in law, either as to the whole interest or any undivided part thereof, by any instrument of writing, which is required to be recorded in the patent-office within three months from the date.

By the eighteenth section, the patentee may make application

or the extension of his patent to the Commissioner, who is required to publish a notice of such application "in one or more of the principal newspapers in the city of Washington, and in such other paper or papers as he may deem proper, published in the section of country most interested adversely to the extension of the patent." "And the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the evidence produced before them both for and against the extension, and shall sit for that purpose at the time and place designated in the published notice thereof. The patentee shall furnish to said board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention. And if, upon a hearing of the matter, it shall appear to the full and entire satisfaction of the said board, having due regard to the public interest therein, that it is just and proper that the term of the patent should be extended by reason of the patentee, without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the Commissioner to renew and extend the patent," &c. ; "and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years. And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein."

This section embraces patents previously issued, and the construction now to be given to it operates on all cases of extensions under it, whether the assignments were made before or after the passage of the act.

The object of this section is so clearly expressed as not to admit of doubt. It was for the exclusive benefit of the patentee ; for the extension can only be granted when it shall be made to appear that the patentee, "without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for his time, ingenuity, and expense," &c. This, then, being the clear intent of Congress, expressed in this section, it must have a controlling influence in the construction of other parts of the section. A statute is construed by the same rule as a written contract. The intent of law-makers, and of the persons contracting, where that intent clearly appears, must be carried into effect. Where the statute or the contract is so repugnant in its language as not to show the intent, then no effect can be given to it. If the words used be susceptible of such a construction as

not only to show the intent, but to enable the court to give effect to it, it is the duty of the court so to construe it.

Bacon, on the construction of statutes, says, — " The most natural and genuine way of construing a statute is to construe one part by another part of the same statute ; for this best expresseth the meaning of the makers." And, — " If any part of a statute be obscure, it is proper to consider the other parts ; for the words and meaning of one part of a statute frequently lead to the sense of another." " A statute ought, upon the whole, to be so construed, that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."

That the patentee may have his patent extended, though the assignee held the entire interest in it, is undoubted. He has only to show that he has not been reimbursed, &c., within the meaning of the section, to establish his claim for an extension. And, in such a case, if the benefit of the extension go to the assignee, he having the entire interest in the patent, how is the patentee benefited ?. And yet the law was enacted exclusively for his benefit. Does not such a construction defeat the object of the law ? And if it does, can it be maintained ? Where the assignment of the patent has been for less than the whole, the same objection lies, though the object of the law is subverted only to the extent of the assignment.

The interest of the assignee, it is supposed, is protected by the provision, that " the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein." There can be no doubt that the words, " to the extent of their respective interest therein," refer to their right to use the thing patented.; and this, it is contended, is the benefit which results to the assignee from the renewal. That this would seem to be the import of these words, disconnected from other parts of the section, is admitted ; but such a construction is wholly inadmissible, when the object of the section is considered.

The patent is extended for the benefit of the patentee. This is so obvious that no one will deny it. And the above construction gives the benefit to the assignee. Here is a direct repugnancy, and there is no escape from it ; for the same repugnancy exists, though in a less degree, where a part of the patent only has been assigned. Under such circumstances, we must inquire whether this repugnancy may not be avoided by giving another and a different application to the provision, of which the words may be susceptible.

The benefit of the renewal is given to the assignees ; but to what extent ? — to the extent of their interest in the renewal. But it is said, that this cannot be the true construction, as it renders the provision inoperative. If, by the assignment, there was an ex-

Wilson *v.* Rousseau et al.

press contract that the assignee should enjoy the same interest in the renewal or extension of a patent, this would secure such interest, without the provision.

To this it may be answered, that such an assignment of a thing not *in esse* would, at most, only be a contract to convey the legal right. But, under the eighteenth section, the assignment after the extension becomes a legal transfer. In addition to this, the right under the extension being legal, all purchasers would be affected with notice, where the assignment had been recorded in the patent-office. This view gives effect to the section, and harmonizes its provisions. The other construction makes the parts of the section repugnant, and nullifies the whole of it. Now, which is the more reasonable view? But, in addition to this, what conceivable motive could Congress have had to give a boon to the assignee? How is he injured by the extension?

Without the extension, the assignee would only have a right, in common with all others, to use the invention. This could be of no more value to him than the worth of his machinery; for competition equally open to all cannot be estimated of any value. Under the assignment, the assignee claims a monopoly. Now, did Congress intend to give him this boon? Why should he be an object of public munificence? He laid out his money in the purchase of the patent right, because he believed it would be profitable. And, in most cases, the assignee speculates upon the poverty of the inventer. Inventers are proverbially poor and dependent. The history of this patent illustrates strongly this fact. Half of the right was originally assigned to pay the expense and trouble of taking out the patent. Another part of the patent was assigned to compromise a pretended claim to a similar invention.

The hardship complained of by the assignee is more imaginary than real. If the patentee takes all the benefit of the extension, the assignee loses, it is said, the value of his machinery. This does not necessarily follow. For if the machinery has been judiciously selected, and put in operation at a proper place, it will sell for its value generally, if not always. If the invention be of great value, as is undoubtedly the case in this instance, the machinery will be wanted by any one who may wish to continue the business, under the extended patent. So that the loss in the sale of the machinery would not be greater than would have been suffered by a sale if the patent had not been extended.

This construction, then, inflicts little or no injury on the assignee, whilst the other construction, as has been shown, defeats the object of the statute. But this inconvenience or loss to the assignee is duly considered and weighed, under the statute, as the board, in granting the extension, must have a due regard to the public interest. Notice is to be given, as far as practicable, to all persons interested against the extension of the patent, who may

appear before the board and oppose it. And it was stated in the argument, that the assignees of this patent did oppose the extension of it. Little did they suppose at the time that they were resisting a boon secured to them by the above section. Whatever loss, real or imaginary, the assignee may suffer from the extension of the patent, is a loss or inconvenience which results from the general advancement of the public good, and for which society does not, and indeed cannot, make compensation. The price of property is affected by general legislation. An embargo is laid, and ships, during its continuance, are valueless. The increase or diminution of the tariff affects beneficially or injuriously the value of machinery used in manufactures. The reduction of the price of the public lands affects the price of lands generally in the new States. An act authorizing a company or individual to construct a railroad renders useless turnpike roads in its neighbourhood, and the public houses established thereon; but for these injuries no compensation is made. Indeed, it is difficult to find any great public enterprise which does not, in a greater or less degree, affect injuriously private rights. But these must yield to the general welfare of society.

All enlightened governments reward the inventer. He is justly considered a public benefactor. Many of the most splendid productions of genius, in literature and in the arts, have been conceived and elaborated in a garret or hovel. Such results not only enrich a nation, but render it illustrious. And should not their authors be cherished and rewarded?

If the assignee under the eighteenth section take any thing, in my judgment he takes the whole extent of his interest, — the whole or nothing. And it appears to me the construction given by the court is, if possible, less warranted by the section, than to hold that the assignee takes under the extension the entire interest assigned.

The words, "and the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein," cannot, it seems to me, by any known rule of construction, be held to give to the assignee or grantee the right to use the machine he may have had in operation at the time the extension took effect. The words, "to use the thing patented," are descriptive of the right assigned or granted, and refer to such right, not to the mere use of the machine. "The extent of their respective interest therein" undoubtedly covers the whole interest, and cannot refer merely to the number of machines the individual may have in operation.

Mr. Justice WAYNE expressed his dissent from that part of the opinion of the court which, in answer to the second question, gave a right to an assignee to continue the use of the patent-

Wilson v. Rousseau et al.

ed machine, and said he would probably file his reasons with the clerk.

Mr. Justice WOODBURY.

There is one of the leading questions certified to us in this cause, in the decision of which I have the misfortune to differ from a majority of the court.

As that decision bears on several of the other questions, and also disposes entirely of some of the four causes connected with this matter, which have been so long and so ably under argument before us, I consider it due to the importance of this subject to the parties and the public, as well as just to myself, to state the reasons for my dissent.

The difference in our views arises in the construction of the eighteenth section of the patent law of July 4th, 1836, and relates to the benefits which may be enjoyed under it by assignees and grantees.

Before the passage of that law, a patent could not, under any circumstances, be extended in its operation for the benefit of any body beyond its original term, except by a special act of Congress. But this section allowed a patentee to apply to a board of officers and obtain from them a renewal of his patent for seven years longer, provided he offered to them satisfactory proofs that his expenses and labor in relation to the patent had not been indemnified. It provided further, that the renewal be indorsed on the back of the original patent ; " and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years." It then added, " And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein." This last clause creates the chief embarrassment. In this case, the patentee having died, and we having just decided that a renewal was legally granted to his administrator, the controverted question about which we differ is, whether that renewal inures exclusively to the use of the patentee through his administrator, or goes either in full or in part to his assignees and grantees under the old patent. In the present case it is conceded, that by the contract of assignment or grant, nothing is expressly conveyed but the old patent, and in words, only for the original term of " fourteen years."

The question is not, then, whether, when assigning an interest in the old term, before or after the passage of the act of 1836, it might not be competent and easy to use language broad and explicit enough to transfer an interest in any subsequent extension by means of the contract of assignment, and this be confirmed by the words of the eighteenth section ; but whether those words alone transfer it, or were intended to transfer it, when the contract of as-

signment, as in this case, was made before the act of 1836 passed, and referred, *eo nomine*, only to the old patent, and expressly limited the time for which the patent was assigned to the old term.

In such case, it seems to me that both the language and spirit of this section restrain its operation to the patentee or his legal representatives, and convey no rights in the extension to assignees or grantees, whether prior or subsequent, except where the patentee had clearly contracted that they should have an interest beyond the original term.

But the majority of the court hold here, that this clause, independent of any expression in the assignment, transfers an interest in the extension to all assignees and grantees, so that they may continue to use any machines already in operation during the new term, without any new contract, or any new compensation for such farther use.

The argument on the part of the assignees, in all the cases before us, on this subject, has been, that by force of this section all assignees before authorized to make, vend, or use these machines, for fourteen years, could continue to make and vend, as well as use them, for seven more, without any new contract or new consideration; and that "grantees of the right to use" should have a like prolongation of all their interests. And such seems to have been the opinion of the Circuit Court in Maryland, in Wilson *v.* Turner, October term, 1844, Chief Justice Taney presiding, though other points besides arose there, and were disposed of in that opinion.

But now, for the first time, it is believed, since the passage of the patent law, this court, by force of the last clause in the eighteenth section, not only give to assignees and grantees a greater or longer interest in the thing patented than was given in the contract of assignment to them, but undertake to introduce a novel discrimination, not seeming to me to be made in the clause itself, and give to assignees of the patent right itself an extension of only a part of their former interest, but to "grantees of the right to use" the patent, an extension of all their former interests.

We propose to examine the objections to this decision of the court, first, on the principle of giving to old assignees and grantees an extension of their interests to the new patent at all, unless the contract of assignment to them was manifestly meant to embrace any new term; and, after that, to examine the propriety of the discrimination in allowing a right in the renewed patent to grantees of the use, to the extent of all their old interests, and withholding a like privilege from assignees of the patent itself.

First, it has been repeatedly decided, that "a thing which is in the *letter* of a statute is not within the statute, unless it be within the intention of the makers." Dwarris on Statutes, 692 ; Bac. Abr. *Statute,* T ; 2 Instit. 107, 386.

Here the great design of the whole section was to extend assistance to an unfortunate and needy class of men of genius, who had failed to realize any profits from their valuable inventions during the first term of their patents. The intention of the makers of this law is usually conceded to have been relief to such patentees, and not to assignees or grantees.

It was the former, and not the latter, who were sufferers, and whom Congress had before, by special acts of extension, occasionally tried to indemnify for their losses ; and to whom now, in a more summary way, on application and proof by them alone, an extension was authorized to be given by a board of officers, in order that they and not others might reap the profits of such extension.

But, by allowing the benefit of it to go to the former assignees of only the old patent, the intention of the makers appears to be defeated, and those profited who have not proved any loss or suffering, but, on the contrary, may have already derived great advantages from the assignment.

It might thus happen, likewise, where, in a case like this, the patentee has assigned all his old patent before the extension, and the use of it under the extension would constitute all or its chief value, that neither he nor his representatives — he whose genius had produced the whole invention, at the sacrifice of time and toil, and whose sufferings, losses, and disappointments the law is expressly made to indemnify — would receive the smallest pittance from it ; but those reap all its advantages who may already have grown rich by the assignment to them of the old patent, and who nobody can pretend were the particular or principal objects of relief. Under such a construction, how absurd would it be for such a patentee ever to apply for an extension, when he must do it at new cost and expense, and then have the whole fruits of it stripped from him by persons who had neither paid for the extension, nor had it conveyed to them. It is an equal violation of the leading intention of this section, and of most of these principles and of much of this reasoning, to allow, as the opinion of the court does, such persons to take, unpaid for and unbought, a *part* of the benefits of the renewal, as to take the *whole* of them.

Secondly, by the construction of the court, contracts and vested rights seem to be radically encroached upon. Under it, an assignee of an old patent, limited in the contract conveying it to fourteen years, will, for some purposes, get it for twenty-one years, directly in conflict with the express stipulation of the parties. Congress will, in this way, be made unworthily to tamper with the private obligations of individuals, and will impair them by taking from the rights of one, and enlarging or adding to the rights of the other ; and this without any new consideration or new engagement passing between them, but, on the contrary, against the wishes, assent, and interests of one. That view, also, involves us in the unreasonable inference,

that Congress intended to violate a solemn compact, to disturb the vested rights and written agreements of parties, when the language used is susceptible of a different construction, and one that is consistent with what is just, and with the spirit of the whole section.

By that view, an assignee or grantee will obtain " a right to use the thing patented" for a term of seven years longer than he contracted or paid for, while the patentee, without any such agreement in his contract assigning or granting the right to use, and without any new consideration, will be deprived of all his new and vested rights in the extension, so far as regards that use, and will have his former contract impaired virtually in its whole vitality, by making him part with the use for a term of twenty-one years, when the contract says but fourteen, and making him do it, also, without any application by others for the extension, any proof by others of not being indemnified, any payment by others of the costs and expenses for procuring the additional seven years, and when the avowed and cardinal object of the renewal was to indemnify him alone for losses which he and not others had sustained. Well may he say, as to these new and extended interests attempted to be conferred on assignees and grantees beyond the contract of assignment, *in hæc federa non veni.*

Thirdly, the construction I contend for seems to me the only one consistent with the language used in the latter portion of the eighteenth section. By this, no part of those troublesome four lines is senseless, or expunged, or ungrammatical, or contradictory to the object of the previous portion of the section. While the construction opposed to this must, in my view, require interpolations or extirpations of words, and a violation of the object of the rest of the section, in order to give to the clause the meaning the advocates of that construction impute to it. Look at the phraseology of the clause. " *The benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein,*" but surely to no more than that *extent.* It would violate both the words and design to have them enjoy more than the extent of their interests therein, quite as much as not to let them enjoy all of the extent of them. In the construction of statutes it is a well settled axiom, that, " to bring a case within the statute, it should be not only within the mischief contemplated by the legislature, but also within the plain, intelligible import of the words of the act of parliament." Brandling v. Barrington, 6 Barn. & Cressw. 475. In this case the assignees and grantees were not within either the mischief intended to be remedied, that is, a want of indemnity for losses by the patentee ; or within the " plain, intelligible import of the words," as their contract of assignment or grant did not extend to the renewed term at all, for any purpose whatever, but was expressly limited to the fourteen years of the original patent.

There must be some measure of their respective interests, when

Wilson v. Rousseau et al.

the act passed. What was it? Clearly, the contracts under which they had been acquired. Nothing had been done, either in other acts or previous portions of this, to increase those interests beyond the contracts, but merely to enable assignees and grantees of exclusive rights to protect them by suits in their own names. The present clause, also, does not profess to increase those interests, but simply to let assignees and grantees enjoy them under the renewal, if by their extent by the contract which limits and defines them they run into the extended term. Various hypotheses and metaphysical refinements have been resorted to for the purpose of putting a meaning on the words of this clause differing from this, which is so plain and so consistent with the spirit of the section; and virtually making it provide, that assignees and grantees shall have more benefits under the renewal in the thing patented than the " extent of their respective interests therein."

But before testing more critically the extent of those interests by the only standard applicable to them, it will be necessary to consider separately the true meaning of two of the words employed in this clause, namely, " *renewal* " and " *therein*."

Much research has been exhibited, in attempting to draw distinctions in this case between the words *renewal* and *extension*. But I am not satisfied that any exist, when these words are employed as in this act of Congress, or in contracts relating to this subject. It is true, that some " renewals " are not " extensions," in the sense of prolonging the term of the patent, — that is, when an old patent is surrendered and a new one taken out, or a renewal made for the rest of the term, — while all *extensions* prolong the term. But still " renewals " are as often used for a prolongation of the term, or for a new term, as *extensions* are, and in this very section, " *to renew and extend* " is used as if synonymous, and this in sound analogy to the use of the word *renewal* on several other subjects. Thus, to renew a lease is to extend it another term. To renew an office is to extend it another term. To renew griefs, *revocare dolores*, is to extend them. Again; the second " *therein*," at the close of the clause, has been considered by some as meaning " in the *renewal*," and by others, " in the *right to use*," and by others still, " in the thing patented." But, grammatically, it refers to the " thing patented," and hence " the interests therein " are " the interests in the *thing patented*."

Phillips treats it as a matter of course to mean " in the *patent*," and uses that as synonymous to " therein," and though, in regard to my construction of the whole clause, the result is much the same, whether " therein " is considered to mean in " the thing patented," or " the patent," or " the renewal," yet I incline to the first view of it as that most strictly grammatical and the most natural, as well as coming nearest to the views of this court in

M'Clurg *v.* Kingsland, 1 How. 210. Further objections to its meaning "in the right to use ".will be stated hereafter, under another head. Passing, then, to a more careful scrutiny of the whole clause, it would seem, that there could be but one rational test of "the extent" of the interests of assignees and grantees in the thing patented, and that such test must be the previous contract of assignment or grant, under which alone they hold any interests.

If that contract grants to them one fourth or one half of the old patent, or the use of it in one State or county, and for a term of five years, or ten, or fourteen, from the issue of the patent, then such and such alone is the extent of their interests, and they will not run into the new term. But if the contract goes further, and grants one half or all of the old patent to assignees, and for a term not only of fourteen years, but twenty-one years, or any number to which the patentee may afterwards become entitled by any extension or new grant, then such is the extent of their interests, and they will in such case run into the new term. This view gives meaning and spirit to every word, and excludes or alters none. This, too, conforms to the design of the section in taking away no part of the benefit intended to be conferred by it on the patentee, unless he has chosen to dispose of it clearly and deliberately, and receive therefor, either in advance or after actually granted, such additional consideration as he deemed adequate and contracted to be sufficient.

If after the word " *extent* " in this clause, there had been added, what is the legal inference, *both in time and quantity*, this meaning might have been still more clear to some. But without those words, the extent of interest seems to me to depend as much on the length of time the patent is granted to the assignee, as on the dimensions of territory over which he may use it, or the proportion of the whole patent he is authorized to use. It is like a leasehold interest in land, or a grant of it. The extent of interest by such a grant of land is more or less, as the term is shorter or longer, quite as much as if the land conveyed is more or less in quantity.

The word "extent," in common parlance, varies somewhat in meaning, according to the subject to which it is applied, and as that changes, it may as well refer to time as to space, or proportion ; and more especially so, when applied to interests, as in patents, for a particular term of years.

There is another analogy in support of this view, that has not been urged in the ingenious arguments offered, but has struck me with some force. A patent was the description once applied to commissions for office ; and the records of this court at first speak of the commissions of the judges as patents.

Now what is the extent of interest the incumbent has in any

office under his commission or patent ?  Clearly, in part, the length of time it is to run, whether four years, during good behaviour, or for life, and in part only its yearly profits ; often quite as much depending on that length of time, as the amount of the salary or fees annually attached to the office.

What is the chief objection in reply to all this ?  Nothing, except that the assignee could get protected to the extent of his interest, in this view, by the contract alone, without the aid of the provision at the close of the eighteenth section, and hence that the provision is in this view unnecessary or nugatory, and must have been inserted for some other purpose.   But were it in reality unnecessary, that would not require us to consider it as intending something different from its words, or different from the previous contracts of the parties.   Legislatures often add clauses to acts, which do not prove to be in reality necessary, but are inserted from abundant caution and to remove future doubts or litigation.   So, in this very act, in the eleventh section, it is declared, that a patent may be assigned.   Yet this is probably unnecessary, as an interest like that of a patentee can of course be assigned, on common law principles, without the aid of a statute.

When we look, however, to another circumstance, — that, though a contract of assignment would, without any clause in the statute, pass the interest to the assignee, yet it would not enable him to sue in his own name, — we can discover another reason for this provision still more effective.   A clause had been inserted in a previous part of the act to enable the assignee to sue in his own name on the old patent, if violated ; and, probably in doubt whether such provision would be extended to assignees under the renewal, when having any interest therein, it was provided further, that " the benefit of the renewal " should reach them to the extent of their interests therein, — a part of which benefit would be to sue in their own name for any infringement on their rights to it, as fully as they could do for a violation of their rights in the original patent, and as if that had been for twenty-one years.   The provision thus would be far from nugatory, by clearly conferring on them every power and privilege to sue under the extension which they possessed under the original patent.

By means of this provision, also, in another view, the condition of the parties might be changed, from a reliance on a contract alone that they should have a certain interest in the new patent, to a vested interest in it ; or, in another view still, from an executory to an executed right.

There is, in the construction given by some of the majority of the court to the clause immediately preceding this, another ample reason for inserting such a provision.

The previous clause, stating, that " thereupon the said patent shall have the same effect in law as though it had been originally granted for

the term of twenty-one years," would, it is argued, if the section had there ended, have conferred on any assignee or grantee of the old patent, or any part of it, the extended term, so as to enable them to use the patent as if it originally had been granted for twenty-one years instead of fourteen.

Suppose, then, for a moment, that this construction was considered by Congress proper, or only possible, it is manifest that the additional clause which follows had a second and most pregnant object, — no less than to prevent that consequence, so hostile to the design of inserting the whole section, — to grant an extended term for the benefit and indemnity of the patentee, and not of the assignee. In this view, the last clause might well be added, as a limitation on what would otherwise be the inference from that just preceding it; and might well declare, instead of this inference, that assignees of the old patent should not hold it, in all cases, as if originally granted for twenty-one years, though patentees might; but that assignees should hold only in conformity to " the extent of their respective interests " in the thing patented. In other words, if by contract they had acquired clearly an interest for twenty-one years, they should hold for that time ; but if by contract they had acquired an interest for only five or fourteen years, they should hold it only to that extent. This is rational, consistent with the great object of the section, and gives new and increased force and necessity to the clause. The assignees would then, after the renewal, hold the patent for all the time they had stipulated, and for all they had paid, but for no more.

It will be perceived, that very few assignees or grantees, prior to the passage of the act of 1836, would in this view be likely to come under this provision, and be benefited by it; because, not knowing that any future law would pass allowing an extension, very few would be likely to anticipate one, and provide in their contract and pay for a contingent interest in its benefits.

This would make the provision, in practice, apply chiefly to future assignees, who, knowing that such a provision existed, might be willing to give something for a right to any extension which might ever take place under it ; and therefore might expressly stipulate in the assignment for that right. Indeed, the arguments on the part of the patentee in this case have mostly proceeded on the ground that this provision was intended to apply solely and exclusively to future assignees. Considering that any other construction is in some degree retrospective, and that this would give force to the provision, as well as preserve the spirit of the section, I should be inclined to adopt it, if mine did not produce a like effect, and was not alike free from objection, as limited by me : because I do not make the provision retrospective except in cases where the parties had expressly contracted that the prior assignee should receive the benefit of any extension, and in that case it has the preference in its operation

Wilson *v.* Rousseau et al.

over the other view, as it carries into effect that express compact, and does not cramp the force of it to the future alone, where the language and the consideration are equally applicable to past engagements of this character.

This conclusion is also strengthened by being in harmony with all the leading rules of construction applicable to statutes, while that adopted by the court seems, to my mind, to violate some of the most important of them.

Beside those already referred to, it is well settled, that " if a particular thing be given or limited in the preceding parts of a statute, this shall not be taken away or altered by any subsequent general words of the same statute." Dwarris, 658 ; Standen *v.* The University of Oxford, 1 Jones, 26 ; 8 Coke, 118, *b*. Here a particular benefit is, by the former part of the eighteenth section, conferred on a patentee, for reasons applicable to him alone ; and yet, in this case, by the opposite construction, a few general words towards the close are construed so as in some respects to destroy entirely all those benefits to the patentee ; and that, too, when the language is susceptible of a different construction, more natural and perfectly consistent with the previous particular grant to the patentee.

Some collateral considerations have been urged in support of the conclusions of the court on this branch of the construction, which deserve notice. On a close scrutiny, they appear to me to amount to less in any respect than is supposed, and in some particulars strengthen the grounds of dissent. Thus, it has been said that the English act of the 5th and 6th of William the Fourth, passed September 18th, 1835, was before Congress in 1836, and was intended to be copied or adopted ; and as, under that, assignees have been allowed to participate in the extended time, it has been argued that such was the intention here. But it is doubtful whether that act was before the committee when they reported the bill in 1836, as the intervening time had been short, and the eighteenth section, on examining the journals and files, appears not to have been in the bill at all as originally introduced, or as originally reported ; but was afterwards inserted as an amendment in the Senate. The consideration of this section, therefore, does not seem to have been so full as of the rest of the bill ; and it is very far, in language, from being a copy of the English act. Assignees are not named at all in that act ; and though, in extensions under it, assignees have in two or three cases been allowed to participate, it has only been where an enlarged equity justified it, — as where the patentee consented, or was to receive a due share in the benefits, or had clearly conferred a right in the extension by the assignment ; and where, also, the assignees are expressly named in the new grant or patent as entitled to a share of it. See Webster's Patent Cases, 477.

There, also, an assignee, under like circumstances, would doubt-

less benefit by the renewal, under its ordinary operations ; and the practice in England, thus limited, will fortify rather than weaken the construction I adopt of the true design of the last clause in our own law.

There is much, also, in another collateral consideration here, which does not apply in Great Britain, and which restricts confer-ring the benefit of an extension, or an extension itself, on an as-signee by or under any statute, if it goes beyond what a patentee had himself contracted to do.

Here the Constitution limits the powers of Congress to give pa-tents to inventers alone.

" The Congress shall have power to promote the progress of science and the useful arts, by securing, for limited times, to authors and inventers, the exclusive right to their respective writings and discoveries." — Article I., § 8.

No authority is conferred to bestow exclusive rights on others than " authors and inventers " themselves.

Hence a patent could not probably be granted to an assignee, nor an extension bestowed on one, independent of the assent or agreement of the patentee, or of its inuring to his benefit, without raising grave doubts as to its being a violation of the Constitution. But so far as inventers have expressly agreed that assignees shall be interested in their patents, or in the extensions of them, the latter may well be protected ; and so, as far as administrators represent the inventer or patentee, when deceased, the grant to them is substan-tially a grant to the inventer, as the benefit then inures to his es-tate and heirs. But to grant an exclusive right to an assignee would confer no benefit on the patentee, or his estate ; and it would violate the spirit as well as letter of the Constitution, unless the inventer had himself agreed to it, and had substituted the assignee for himself by plain contract, whether for the original term or any extension of it.

Cases have been cited in this country, likewise, where Congress, in ten or twelve instances, have renewed patents to the inventers ; but they have never done it to assignees. And though in two out of the whole, which were renewed after the term had expired and the assignees and the public were in the free use of the patent, some limitations have been imposed on requiring further payments from the assignees for the longer use of the old patent ; yet in these only, and under such peculiar circumstances, has it been done, and in these no term was granted by Congress directly to the as-signee rather than the patentee ; and this limitation or condition in favor of the assignee, in the grant to the patentee, is of very ques-tionable validity, unless it was assented to by the patentee. In this case it is most significant of the views of Congress to relieve the patentee rather than assignees, that by a special law, passed Feb-ruary 26th, 1845, they have conferred on the representative of the

original patentee still another term of seven years, without mentioning the assignees in any way, and without any pretence that the benefits of this extension were designed for them.

The argument, that the assignee is sometimes a partner, and makes liberal advances, furnishes a good reason, in a pecuniary view, why an assignment should be made to him of such an interest in the old patent as will indemnify him, but furnishes none for giving him, even if he regards money above public spirit or benevolence, more than an indemnity; or for giving him a benefit in any renewal, which it has never been agreed he should have, and for which he never has paid.

So the reasoning, that the assignee stands in the shoes or in the place of the patentee, and represents him, and therefore should have an interest in the extension, applies very well, so far as he is assignee, or so far as the contract extends. But he no more stands in the shoes of the patentee beyond the extent of his contract, than an entire stranger does. Such are the cases of Herbert *v.* Adams, 4 Mason, 15, and that cited in 1 Hawk. P. C. 477, note.

In one, the assignee of the old patent represented the patentee as to that, and that only; and in the other, where by law a further copyright was authorized in all cases, and the patentee assigned his whole interest, the second term passed also; because the law had previously given it absolutely, without contingency or evidence of losses, but in connection with, or appurtenant to, the first copyright.

Again, it has been urged that the assignee should have the benefit of the extension; otherwise he may have made large expenditures, in preparing for a free use of the patent after the original term expires, and will loose them in a great degree, or be obliged to pay largely for the continued use of the patent. But this same reasoning applies equally well to the whole world as to the assignee; because any individual, not an assignee, may have incurred like expenditures in anticipation of the expiration and free use of the old patent. In fact, the argument is rather a legislative than judicial one, and operates against the policy of the whole section, rather than the construction put on the last clause.

But the hardship to any person, in such case, is more apparent than real. The price to be paid for the new patent is not so much as the gain by it, and hence those who have proposed to use it and do use it after the extension, and pay anew for a new or further term, gain rather than loose, or they would have employed the old machinery in operation before this invention.

Nor is it any relief to the community at large, as seems by some to have been argued, to hold that the renewal, or a large part of it, vests in the assignee and grantee rather than in the patentee. For the great mass of the people must still purchase the patent, or the

right to use it, of some one, and must pay as much for it to the assignee as to the patentee.

Finally, the construction of the court, by conferring any privilege whatever on assignees and grantees beyond the extent of their interests in the thing patented, when those interests, as in this case, were expressly limited in the contract to the term of the old patent, goes, in my view, beyond the language of the act, beyond the contract of assignment, beyond the consideration paid for only the old term, and beyond any intention in the legislature for relief or indemnity to others than unfortunate patentees.

I feel not a little fortified in these views on the case, by several decisions and opinions that have heretofore been made, in substantial conformity to them. Indeed, independent of opinions in some of the actions now before us (from which an appeal has been taken, or the cause has come up on a certificate of division), every reported case on this subject has been settled substantially in accordance with these views. See Woodworth v. Sherman, and Woodworth v. Cheever et al., Cir. Ct. for Mass., May Term, 1844, decided by Justice Story; Van Hook v. Wood, Cir. Ct. for New York, October Term, 1844, by Justice Betts; Wilson v. Curteis & Grabon, Cir. Ct. for Louisiana, by Justice McCaleb; Brooks & Morris v. Bicknell et al., Cir. Ct. for Ohio, July Term, 1844, by Justice McLean (Western Law Journal, October, 1845); Butler's opinion, as Attorney-General, in Blanchard's case (Opinions of Attorneys-General, pp. 1134 and 1209).

All that remains for me is to advert a moment to that branch of the construction adopted by the majority of the court, which, after giving to both assignees and grantees a benefit in the new patent or term beyond " the extent of their interests " under the contract of assignment, undertakes to go still farther, and make a discrimination between assignees and grantees, as to the enjoyment, under the renewal, of their different original interests. It gives to the latter, the grantees, by the mere force of this last clause in the eighteenth section, the enjoyment of all their old interests during the whole of the new term ; but it gives to the former, the assignees, the enjoyment of only about a third portion of their old interests during that term. In other words, it gives to " grantees of the right to use the thing patented " a continuance of all their interests ; but to assignees, whose interests extended to the right to make and to vend, as well as use, the thing patented, a continuance of only a part of theirs. In such a discrimination, uncountenanced and unwarranted, as it seems to me, by either the words or the spirit of the act of Congress, I am sorry to find another strong ground of dissent to the opinion of the court. The act does not say, as is their construction, that " the benefit " of only " the right to use the thing patented " shall extend to any one, whether an assignee or grantee ; but that the benefit of the re-

newal shall extend to both, " to the extent of their respective interests," though differing clearly in extent as they do, and as will soon be more fully shown.

" Judges are bound to take the act of parliament as the legislature have made it." 1 D. & E. 52, and Dwarris on Statutes, 711.

But the words in this act, " the right to use the thing patented," must be transposed, and other words altered in their ordinary meaning, to make these a description of the interests conferred.

They are now a description of one kind of purchasers, that is " grantees of the right to use the thing patented," to whom the renewal should extend, if they had stipulated for any interests therein by their contracts. The clause refers to two classes, who may in such case be benefited by the renewal. " Assignees " are one class, and " grantees of the right to use the thing patented " are the other class. This accords with the language itself, and also with the punctuation of this clause, as examined by me in manuscript on file in the Senate, and as printed by the State department, having no comma or other pointing in it except after the word " patented." It accords, too, with what is well understood to be the fact, that assignees and grantees usually constitute two distinct classes of purchasers, the former being those who buy a part or all of the patent right itself, and can protect their interests by suits in their own name ; and the latter being those who buy only " the right to use the thing patented," and generally, except where the use is exclusive (fourteenth section), cannot institute suits in their own name for encroachments upon it. In the face of this, to hold that assignees and grantees mean the same thing here, and that the words " of the right to use the thing patented " apply equally to both, is a departure from the above established usage in employing those terms, and gives a different meaning to them from what is previously twice given in this very act. Thus in the eleventh section an " assignment " is mentioned as one thing, and " a grant and conveyance of the exclusive right," &c., as another, and in the fourteenth section, " assigns " are spoken of as if one class, and " grantees of the exclusive right," &c., as if another. And why does the conclusion to this clause say " to the extent of their *respective* interests therein," if such assignees and grantees as to patents were not in this very clause considered by Congress as having different interests, and that these were to be protected according to their *respective* extents ? It would have said, and must be made to say, if sustaining the construction of the court, " to the extent of that *right*," or " to the extent of that *interest*," and there stop. Manifestly, then, there is not conferred on these two classes, by this clause, either in its spirit or *in totidem verbis*, merely " the right to use the thing patented," but on the contrary, " the benefit of the renewal," " to the extent of their respective interests in the

thing patented." The interests of the grantees may be limited to the use, and those of the assignees may not be, but include the right to make and vend as well as use ; yet large or long as may be the interests of either, the benefit of the renewal is to cover them, if *the extent* of them, under the original assignment or grant, reached to the new term. One is not to have the whole of his interests protected and the other a part only, when their equities are the same. But the assignee is to have to the extent of his, which is to make, vend, and use ; and the grantee only " of the right to use" is to have to the extent of his.

This, to my apprehension, is unquestionably the substance of what Congress has said on this topic ; and yet it is only by sup-posing new language not in the act, or by transposing some of the old, so as not to be in harmony with the original structure of the sentence, or by giving a meaning to words different from what has been established and, in my view, only by doing this, that any foundation can be laid in support of this part of the construction approved by the court. But " it is safer," said Mr. J. Ashurst, " to adopt what the legislature have actually said, than to suppose what they meant to say." 1 D. & E. 52 ; 6 Adolph. & Ellis, 7.

It may be well, also, not to forget, that it is always more judicial, and less like legislation, to adhere to what Congress have actually said, and that it is more imperative to do this when by adhering to it you carry out, as in this case, the manifest intention of the previous part of the section. Nor can the inconsistency produced by the con-struction of the court be without influence in creating doubts as to its correctness ; as by it " the benefit of the renewal " will be ex-tended to assignees and grantees not in a ratio with " their respect-ive interests," — the words of the law, — nor in conformity to their respective contracts, nor according to the respective considerations they have paid, nor in proportion to the respective losses they have sustained, but, under the same general permission as to the extent of the " respective interests " of both, one class will be al-lowed to the full extent of his previous interests, and the other to only a part of that extent.

By what authority, let me respectfully ask, is this general permis-sion thus divided, and in one class or case limited and in the other not ? By what legal authority are assignees cut off from a valuable portion of their interests in a patent, while grantees to use the thing patented are allowed to exercise the whole of theirs, and both under one and the same general permission, covering all " their *respective* interests " ? To make this discrimination, and allow to one class the full extent of their interests and to the other not the full extent of theirs, when the law says it shall be " to the extent of their *respective* interests," and when their respective contracts and equities show that this should include both the duration and quantity of their interests, looks like a distinction in a great degree arbitrary,

and not a little in conflict with the plain words and design of the act of Congress.

But, beside this further departure from what seems to me the obvious meaning of the eighteenth section, caused by this branch of the construction of the court, it will fail, I fear, as any compromise of the difficulties arising under this section, if any compromise be expected from it. It is not likely to avert ruin from most of those indigent inventers, who have in their distresses resorted for aid to the delusive provisions of that section. Their very necessities and embarrassments, which are the justification for granting the renewal to them, have usually forced them to sell and assign all the original patent, as was the case with Woodworth in this instance ; and if in such circumstances the law is to strip them of all benefits under the renewal, and, without any contract to that effect, confer those benefits on the assignees and grantees of the old patent, the law is perfectly suicidal as to the only design to be effected by its bounty. But if, seeing this, the construction is modified, as here, by the court, so as to deprive the patentee in such cases of only the benefits of the use of his old patent or old machines during the new term, this qualification in the operation of the law will, it is apprehended, usually prove a mere mockery, working, in most cases, as fully as the court's construction without the qualification would, the entire defeat of the laudable object of the renewal towards patentees. In one or two of the cases now before us, the patentee, under this construction, will still be subjected to defeat and burdensome costs. In relation to its effect on the present patent as a whole, all the consequences cannot now be ascertained. But it is admitted, that the inventer had assigned the whole of the old patent, so that no right whatever to use will remain in his representatives to dispose of ; or if a right remains where machines are not now in actual use, probably enough are now in use to supply for some time the public wants in most parts of the United States.

The right to continue to use them will probably last during the whole seven years the renewal runs, as the machine will usually, with proper repairs, do service beyond that time. It will not, then, be very difficult to calculate what value, during the seven years, will be derived from the right to make and vend machines, when the use of others already in existence is scattered over every section of the country, and they may be employed all the time of the extended patent, without the assignees or grantees ever having paid or being obliged to pay a dollar for that extended use.

Looking, then, to the beneficent design of the eighteenth section, to enforce the Constitution, by advancing science and the arts, and protecting useful inventions, through the security for a longer term to men of genius of a property in their own labors, in cases where they had not been already remunerated for their time and expenses, I cannot but fear that the construction given by the ma-

jority of the court will prove most unfortunate. It will tend to plunge into still deeper embarrassment and destitution, by losses in litigation and by deprivation of a further extended sale of their inventions, those whose worth and poverty induced Congress to attempt to aid them.

Nor would a different construction tie up, as some suppose, the future use of numerous patents. Of the fourteen thousand five hundred and twenty-six heretofore issued, since the Constitution was adopted, I am enabled, by the kindness of the Commissioner of Patents, to state, that only ten have been renewed under the eighteenth section during nearly ten years it has been in operation.

And if the individuals who use the improved machines, the fruit of the toil and expense and science of others, were obliged in but one case in a year, over the whole country, to pay something for that further use, is it a great grievance? They are not obliged to employ the patent at all, and will not unless it is better by the amount they pay than what was in use before. And is it a great hardship or inequitable, where they are benefited by another's talents, money, and labor, to compensate him in some degree therefor?

While other countries, and Congress, and our State courts are adopting a more liberal course yearly towards such public benefactors as inventers, I should regret to see this high tribunal pursue a kind of construction open to the imputation of an opposite character, or be supposed by any one to evince a feeling towards patentees which belongs to other ages rather than this (and which I am satisfied is not cherished), as if patentees were odious monopolists of the property and labors of others, when in truth they are only asking to be protected in the enjoyment and sale of their own, as truly their own as the wheat grown by the farmer, or the wagon built by the mechanic.

Nor should we allow any prejudices against the utility of patents generally, and much less against the utility of the invention now under consideration, to make our constructions more rigid in this case. The settled doctrine of the courts now, under the lights of longer experience, though once otherwise, is in doubtful cases to incline to constructions most favorable to patentees. Grant et al. v. Raymond, 6 Peters, 218; 1 Sumner, 485; Wyeth v. Stone, 1 Story's Rep. 287; Blanchard v. Sprague, 2 Story's Rep. 169. Nor is it strange that this should be the case in the nineteenth century, however different it was some generations ago, when we daily witness how the world has been benefited since by the patented inventions and discoveries in steam, in all its wonderful varieties and utilities, and in cleaning, spinning, and weaving cotton by machinery for almost half the human race, and in myriads of other improvements in other things, shedding so benign a light over the age in which we live, and most of them excited and matured only

under the protection secured to their inventers by an enlightened government.

Some estimate can be formed of the usefulness of the present patent, and its title to favor, when one machine is computed to perform the labor of planing and grooving in one day that would require fifty days by a man, and which is supposed to reduce near seven tenths the expense of such work in every building where the improved method is used, — as it ere long will be by the many millions of our own population, and in time over the civilized world. Every honest social system must shield such inventions, and every wise one seeks undoubtedly to encourage them.

To be liberal, then, in the protection of patentees, is only to be just towards the rights of property. To stimulate them in this and other ways to greater exertions of ingenuity and talent is to increase the public wealth, and hasten the progress of practical improvements, as well as of science. And to discountenance encroachments on their rights, and defeat piracies of their useful labors, is calculated in the end to better the condition of every rank in society, and introduce wider and faster all the benefits of a superior state of civilization and the arts.